WARNER v. PENOYER et al.

(Circuit Court of Appeals, Second Circuit. November 3, 1898.)

No. 82.

1. NATIONAL BANKS—LIABILITY OF DIRECTORS.

It is the duty of the directors of a national banking association to exercise a general supervision and control over its affairs, and they are required, in the performance of such duty, to act in good faith, with ordinary diligence and intelligence, the measure of the care required being a question of fact, under the particular circumstances of each case. While they cannot devest themselves of such duty of general supervision by committing it to the cashier, they may properly intrust him with all discretionary powers which appertain to the immediate management of the business, including the discounting of paper; and they are not liable for losses occurring through his malversations, unless their own proper care would have prevented such losses. Nor are they required to take measures of unusual precaution, when they have no reason to distrust the integrity or efficiency of the cashier or other employés.

2. SAME—NEGLIGENCE OF COMMITTEES.

The cashier of a national bank permitted an outside corporation, in which he was interested, to become indebted to the bank, through over-drafts and notes of its members, discounted to the amount of $72,000, which was the chief cause of the bank's failure. The directors had an examining committee, and a committee on discounts, whose duty it was to examine the bank's condition and securities periodically. In fact, the committees made no independent examination, but merely checked the notes by a list furnished by the cashier. One of such lists, which was approved some months before the failure, showed eight notes for $5,000 each; but, although the capital of the bank was but $50,000, the members of the committee to whom the list was furnished had no recollection of having seen such notes, nor did they know of the large indebtedness of the corporation. *Held*, that the members of the committees were guilty of negligence which rendered them liable for the losses resulting from the mismanagement of the cashier, but that the other directors were not liable; it not appearing that they had knowledge of the negligent manner in which the committees, on whose reports they relied, had performed their duties.

3. SAME—ACTION AGAINST DIRECTORS—BURDEN OF PROOF.

In an action by the receiver of an insolvent national bank, to charge the directors with liability for losses, proof of general supineness and looseness of management on their part is not sufficient to cast upon them the burden of exonerating themselves, as the court can only charge them with liability for losses shown to have resulted from their negligence.

Appeal from the Circuit Court of the United States for the Northern District of New York.

This was a suit in equity, by John W. Warner, as receiver of the First National Bank of Watkins, N. Y., against William J. Penoyer and others, directors of said bank, to charge them with liability for losses alleged to have been caused by their negligence. There was a decree dismissing the bill (82 Fed. 181), from which complainant appeals.

Edward W. Paige, for appellant.
Frederic K. Collins, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. The First National Bank of Watkins was organized in 1883, had a capital of $50,000, was located in a village of about 3,000 population, and carried a line of deposits and discounts approximating $200,000. It had paid dividends semiannually of 4 per cent., except in 1893, when the usual July dividend was not declared. So far as appears, it was a prosperous and well-conducted concern until within two years of the time of its failure, when, owing to the mismanagement, frauds, and criminal acts of its cashier, its assets were depleted to the extent of about $140,000. February 8, 1894, its doors were closed, and its assets passed into the hands of a receiver. The receiver, alleging in his bill of complaint that the losses of the bank were attributable to the disregard of the directors of their trusts and duties, brought the present action to charge them with the amount. The court below dismissed the bill, influenced largely by the judgment in Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, and convinced that the directors were less negligent than those who were absolved by the supreme court in that case. This appeal requires us to review the whole case made by the proofs, to determine whether there was error in the decision.

There is not a particle of evidence indicating that the directors were aware of the culpable actions of the cashier. They trusted the cashier implicitly, relying on his fidelity and capacity, and had no suspicion of the real condition of the affairs of the bank, apparently not even when the dividend was passed.

Since its organization until his death, which occurred in August, 1892, William M. Love, the father of the cashier, had been the president of the bank. He was the largest stockholder, and took an active part in conducting its business. While he supervised its affairs, there were no serious irregularities on the part of the cashier. These began a month or so before his death, inferably when his failing health devolved larger control and opportunities upon the cashier. The cashier had acted in that capacity since the organization of the bank. He was a small stockholder, and was in good repute financially and morally. Upon his father's death, the management of the bank devolved almost exclusively upon him, none of the directors being bankers, or men of much business experience. August 27, 1892, the directors selected a new president, the defendant Tuttle, who had long been a director, and was probably as well-qualified as any of the board, voting him a small salary. He was a farmer, residing two or three miles from the village, and was one of the largest stockholders. He remained president until the bank failed. He visited the bank frequently, sometimes advised with the cashier about discounts, and, when the cashier was absent, signed drafts, and authorized small discounts. He was not familiar with bookkeeping, and never looked at any of the bank books. A leather wallet, containing the discounted notes maturing the current month, was kept on the bank counter during business hours. He occasionally looked at some of the notes in this wallet. He never investigated the assets of the safe. He relied on weekly statements prepared by the bookkeeper or cashier, and which he examined every Tuesday morning, and upon conferences with the cashier or clerks,

to keep himself informed about the business and condition of the bank. The directors had an examining committee and a discount committee, but these committees only met at the semiannual meetings of the board of directors. At these meetings the cashier would bring in a list, prepared by him, of the outstanding discounted notes, and some of the members of the examining or discount committee would look the notes over, and tally and compare them with the cashier's list. At the meetings held in July, 1892, and in January and July, 1893, the discounts were reported as examined and approved.

The discount committee was composed of two directors and the president. One of these directors visited the bank two or three times a week, and approved such paper as the cashier asked him to consider. The other never acted.

Periodical reports to the comptroller of the currency, in the prescribed form, were prepared by the cashier; the attesting directors accepting his statements without any independent investigation. His statements were likewise accepted, without independent investigation, at the semiannual meeting, as showing the condition of the bank.

This summarizes the evidence respecting the supervision exercised by the president and directors of the business management of the bank. They did not at any time investigate, or cause an investigation to be made of, its resources and liabilities. They all deferred to the better judgment and banking experience of the cashier, and, as testified to by the vice president, the entire management of the bank was practically left to him, as the man best qualified of all those who were interested in it. No evidence is in the record about the examinations by the official bank examiners, or about the circumstances which led to passing the semiannual dividend in July, 1893; nor is there any as to what took place at the semiannual meeting of the directors in January, 1894, the last meeting before the failure.

The principal item of loss for which the receiver seeks to charge the defendants arose from transactions of the cashier with the Western Improvement Company, an association engaged in land speculation, having but little, if any, financial responsibility. The cashier was the vice president and a stockholder of that concern, and his associates were not residents of Watkins. In April, 1892, he discounted a note for $3,046, made by Church, its president, and indorsed by Benger, its treasurer, and placed the proceeds to the credit of its treasurer on the books of the bank. Thereafter, from time to time until the bank failed, he discounted other notes for the concern, among them 10, for $5,000 each, gave it fictitious credits, and permitted it to overdraw its accounts. Nearly all the notes were renewed as they matured, and were carried unpaid until the failure. Some of the notes were made and indorsed by the officers of the company, some of them by the officers as individuals, and some by individuals who were stockholders in the company. The discounted notes were entered regularly in the discount register. Whether or not they were kept in the wallet of the maturing notes does not satisfactorily appear. Kapell, the teller and bookkeeper, was not asked the question.

Miss Hore, the other bookkeeper, testifies that she does not recollect having seen any of them. Tuttle testifies that he never saw any of them. Neither party examined the cashier as a witness, although his testimony was available.

When the bank failed, the Western Improvement Company owed it $72,000; about $24,000 arising from overdrafts, and the balance from worthless discounts. None of the directors knew of the overdrafts, or seemed to have been aware of these discounts. The members of the examining committee testify that they have no recollection of having seen any of the discounted notes among those delivered by the cashier to the directors at the semiannual meetings, except one for $2,500. The cashier's list presented at the meeting in July, 1893, is in evidence, and upon it appear eight notes, for $5,000 each; but the list does not give the names of the makers, or otherwise describe the notes, except as to three, two of which are marked "Lembeck," and the other "G. W. Co." Who "Lembeck" was does not appear, but "G. W. Co." probably designated the Goundry Wagon Company, a concern which was solvent at that time, and in which the vice president of the bank was interested. These are the only notes in the list for above $3,000; the great majority of them being for sums below $300. It appears by the discount register that there were at that time unpaid five notes, each for $5,000, discounted for the benefit of the Western Improvement Company. The defendants Gray and Tuttle, who examined the discounts at that meeting, testify that they have no recollection about any of the $5,000 notes.

The directors of a national banking association are authorized to appoint a cashier, and delegate to him all the usual powers of such an office, including the discounting of notes. Rev. St. U. S. § 5136. To him is properly confided the custody of its property, money, securities, and valuable paper, and the supervision of its books and accounts. He is the executive officer, who transacts its daily affairs. The directors cannot devest themselves of the duty of general supervision and control by committing this duty to him, but they properly may intrust to him all the discretionary powers which usually appertain to the immediate management of its business. Merchants' Bank v. State Bank, 10 Wall. 604; Wild v. Bank, 3 Mason, 505, Fed. Cas. No. 17,646; Bank v. Steward, 37 Me. 519; Sturges v. Bank, 11 Ohio St. 153.

Where they have acted in good faith and with ordinary diligence in exercising their duty of general control and supervision, they are not liable for losses sustained through his malversations. They are not called upon to devote themselves to the details of the business management, and may properly commit these to clerks and bookkeepers, and to the superintendence of the cashier. They are not required to adopt any system of espionage over their cashier, or any of their subordinate agents, or to entertain suspicion without some apparent reason, and, until some circumstance transpires to awaken a just apprehension of their want of integrity, have a right to assume that they are honest and faithful. Scott v. Depeyster, 1 Edw. Ch. 513, 514; Knox v. Eden Musee Co., 148 N. Y. 441–460,

42 N. E. 988; Percy v. Millaudon, 8 Mart. (N. S.) 68. Directors are not merely required to be honest, but they must also bring to the discharge of the duties they undertake ordinary competency. "They cannot excuse imprudence or indifference by showing honesty of intention, coupled with gross ignorance and inexperience, or coupled with an absorption of their time and attention in their private affairs." Williams v. McKay, 46 N. J. Eq. 25, 18 Atl. 824. Before they can be made responsible for losses which have occurred through the mismanagement or dishonesty of the cashier, it must appear that such losses resulted as a consequence of the omission of some duty on their part. If, in all probability, these would have occurred just the same, notwithstanding they had been ordinarily diligent and vigilant, there is no justice in shifting them upon the directors, and no principle of law to justify it. They are responsible for their own acts and omissions, but not for those of co-directors in which they have not actively or passively participated.

It is manifest that the directors in this case relinquished almost untrammeled control of the bank to the cashier, and that their supervision over its affairs was so superficial as to be hardly more than perfunctory. But we are not satisfied that actionable negligence is imputable to them, collectively or individually, were it not found in their laxity of supervision over the discounts. They might have required periodical examinations of the books to be made by experts. They might have insisted upon verifying, by personal investigation from time to time, such details of the bank's condition as they ought to have known before declaring dividends, or as were required to be reported to the comptroller of the currency. And, if they had done so, this falsification of entries and accounts would probably have been discovered, if not prevented. But these would have been measures of unusual precaution, not imperative when there was no reason to distrust the integrity or efficiency of the cashier. They are not to be deemed remiss because they did not resort to exceptional methods, or because they relied on the cashier's supervision over the books and accounts, or because they reposed confidence in his reports of the amount and other clerical details of the assets and liabilities. They were under no duty to observe the extraordinary vigilance short of which a bank cannot be protected from the crimes conceived by a dishonest cashier. The systematic surveillance observed in large banks, especially in city banks, is not customary in the small village banks; and, in considering their conduct, we are at liberty to assume that the bank was visited and examined from time to time by those officers whose statutory duty it is to make a thorough investigation into all the affairs of such institutions and a full and detailed report to the comptroller of the currency. Such investigations, however, cannot be expected to probe the value of the discounted paper of a bank. This depends upon matters outside the cognizance of such an officer,—not only on the genuineness of the signatures and the financial responsibility of the makers and indorsers, but upon various extrinsic circumstances, as whether it is discounted for ordinary business transactions or for speculative enterprises.

We think it was incumbent upon the directors, in the exercise of ordinary prudence, and as a part of their duty of general supervision, to cause examination of this paper to be made with reasonable frequency, and to keep themselves sufficiently informed about it to enable them to pass an intelligent judgment upon its value. The solvency of the bank depended upon the character of this paper, and no dividend could legitimately be declared by the directors, unless they were reasonably certain that it was good and sufficient for the purpose. However honest and capable a bank cashier may be, he is not to be regarded as infallible; and directors are not justified in relinquishing to him unlimited discretion in investing the capital and deposits, and acquiescing blindly in all he does in that behalf. Perhaps the most important function of directors is to exercise an intelligent oversight upon the investments. See Bank Com'rs v. Bank of Buffalo, 6 Paige, 497.

The directors themselves recognized the propriety of maintaining careful supervision of the discounted paper. By resolution of the board, adopted in January, 1892, they provided that no notes of over $1,000 should be discounted unless approved by some member of the discount committee. At the meeting of the board in August, 1892, at which time the new president was elected, an examining committee was appointed, with authority to meet once in each month. It was contemplated that this committee should examine notes monthly, as appears from the record of the board meeting in January, 1893. We cannot doubt that, if the members of these committees had faithfully discharged the duties thus committed to them, or, doing less than this, had manifested their determination to acquaint themselves from time to time with the kind of paper which the bank was carrying, the bank would have escaped the greater part of the loss which it sustained through the paper discounted for the Western Improvement Company. More than this, if there had been reasonably diligent supervision of that character, its deterrent effect upon the conduct of the cashier would have tended, and possibly would have sufficed, to prevent the overdrafts, the false credits, and his misconduct generally. That they neglected such supervision, and did not use ordinary circumspection over this paper, sufficiently appears from the fact that it was examined only once in six months; that at no other time did the president or any member of the two committees undertake or suggest a methodical examination of it, or even any cursory investigation, beyond looking at such notes as the cashier saw fit to consult them about; and that at the semiannual meeting the examinations were so perfunctory that no member of the committee is able to recall having noticed a single one of the eight $5,000 notes which were submitted to the committee on the occasion when the dividend was passed. If any inquiries had been made about any of these notes, exceptionally large in comparison with the ordinary discounts, and representing in the aggregate nearly the whole capital of the bank, some of the directors would have been likely to remember the circumstance. So unquestioned and autocratic was the control over the discounts permitted to the cashier that he apparently resented any criticism, and considered

it presumptuous; and the directors, unwilling to incur his displeasure, refrained from the appearance of surveillance. Mr. Colgrove, a member of the discount committee, in his testimony exhibited the situation in the succinct statement:

"I saw he was offended if I made any suggestions, and I had every confidence in the way in which he conducted the business."

The adjudication in Briggs v. Spaulding does not meet a case like this, because there is but little similarity in the special facts. As was observed in the opinion, "each case has to be determined in view of all the circumstances." Judge Story says (Story, Bailm. § 11):

"Indeed, what is common or ordinary diligence is more a matter of fact than law."

The gist of the decision in Briggs v. Spaulding is stated in the concluding part of the opinion, as follows:

"Without reviewing the various decisions on the subject, we hold that directors must exercise ordinary care and prudence in the administration of the affairs of the bank, and that this includes something more than officiating as figureheads. They are entitled, under the law, to commit the banking business, as defined, to their duly-authorized officers; but this does not absolve them from the duty of reasonable supervision, nor ought they to be permitted to be shielded from liability because of want of knowledge of wrongdoing, if that ignorance is the result of gross inattention. But in this case we do not think the defendants fairly liable for not preventing loss by putting the bank into liquidation within 90 days after they became directors, and it is really to that the case becomes reduced at last."

In this there is nothing inconsistent with the general tenor of the authorities.

We are of the opinion that only those directors, including the president, should be held responsible for the losses, who were members of the discount and examining committees. If these persons had performed their duties faithfully, while it cannot be said that there would have been nothing to criticise in the management of the bank, it may be reasonably inferred that the losses from the discounts for the benefit of the Western Improvement Company would not have occurred. If the other directors were cognizant of the neglect of duty by these directors, the proofs do not show it. The members of these committees were the defendants Tuttle, Colgrove, Bennett, Gray, and Haring. Haring became a member of the examining committee at the July meeting, 1893, and should not be held responsible for any negligence on the part of his predecessors upon that committee. We are not satisfied that there should be any recovery for the losses which did not accrue previous to the directors' meeting of August, 1892.

Perhaps other losses would have been prevented if the members of the discount and examining committees had properly discharged their duties, but the proofs do not satisfactorily show what. The fact that other paper turned out eventually to be uncollectible does not prove that it was such that the directors would have refused to approve, if it had been brought to their notice at the time when it was discounted. As to all these losses, the case for the complain-

ant seems to have been prepared and presented upon the theory that when a bank has failed, and it appears that there was a general supineness and looseness of management by the directors, the burden of exoneration for the losses is on the directors. This is not a correct theory. If it were, the cases would be few in which the directors of a bank, wrecked by the misconduct of a cashier, could not be held accountable for all the losses. The court cannot decree upon conjecture. As against two of the directors, the case for the complainant is predicated upon their failure to attend the semiannual meetings of the board. It is not a necessary or legitimate inference that this omission was a contributory cause of the losses. It does not follow, because a director has failed to attend meetings, that he is legally or morally responsible for the disasters that may have befallen his bank. In the present case the board had provided for a reasonably vigilant supervision of the cashier. The cause of the losses was the neglect of those who had been appointed to keep watch of the discounts. Those directors who attended the meetings, and had no reason to suppose that the members of the discount and examining committees were neglecting their duties, are not responsible for the losses, which are solely attributable to such neglect. The directors who did not attend the meetings are in no worse category. What could they have done or prevented, exercising common diligence, if they had been present? A director who has failed to act is not liable for the thefts or shortcomings of the cashier, unless it appears, inferentially, at least, that his omission had some proximate relation to the losses.

We have reached the conclusion that there should be a decree against the directors named with great reluctance, because their neglect of a proper supervision of the bank was in a sense unintentional, and is palliated by their business inexperience, and they have already sustained very considerable losses as the principal stockholders of the bank.

The decree is reversed, with costs, and with instructions to the court below to decree, conformably with this opinion, against the defendants Tuttle, Colgrove, Bennett, Gray, and Haring. As to the other defendants, the decree is affirmed, with costs.