## CORY MANN GEORGE CORPORATION et al. v. OLD et al.

Circuit Court of Appeals, Fourth Circuit.
January 10, 1928.

No. 2640.

**1. Banks and banking ⟳119—Money deposited in general deposit becomes property of bank, which becomes depositor's debtor for amount thereof.**

When money is deposited with a bank on general deposit, it ceases to be funds of depositor, and becomes property of bank, and the bank thereupon becomes a mere debtor of depositor for amount of deposit.

**2. Banks and banking ⟳57—Depositors' right to recover for directors' negligence depended on their ability to show loss was due to bank's losses occurring through directors' negligence.**

Rights of depositors were not affected by wrongful charging to their accounts of the personal checks of depositors' local manager, and wrongful crediting to manager's personal account of checks which should have been credited to depositors' account, consummated by collusion between depositors' local manager and bank's cashier and bookkeeper, but such transactions merely concealed the wrongful diversion of the funds of the bank, and depositors' right to recover on account of the negligence of bank's directors in supervising bank depended on depositors' ability to show that their loss as depositors was due to the losses of the bank, and that these occurred through directors' negligence.

**3. Banks and banking ⟳57—As respects deposits, bank directors are bank's agents, bound to use care which ordinarily prudent persons would exercise under similar circumstances.**

As respects deposits, bank directors are not insurers or technical trustees, but they are

agents of the banking corporation, charged with the supervision of its business, and as such bound to use that degree of care which ordinarily prudent and diligent men would exercise under similar circumstances.

**4. Banks and banking ☜57—Bank directors held not liable for failing to discover fraudulent collusion between depositors' local manager and bank cashier.**

Where complainant depositors' local manager, through collusion with cashier and bookkeeper of bank, defrauded complainants by wrongfully charging manager's personal checks to complainants' deposit, and by crediting his personal account with checks payable to complainants, directors of bank *held* not personally liable for the losses, on ground of negligence in supervision, because they did not call in customers' passbooks and have them checked with bank's books.

**5. Banks and banking ☜57—Bank directors are not liable for failure to adopt unusual precautions to discover employee's fraud.**

Bank directors should not be held negligent, and chargeable with damages, for failure to adopt exceptional methods to discover bank employee's fraud, or because they relied on cashier's supervision over books and accounts, and reposed confidence in his reports.

**6. Banks and banking ☜78—Transfer of bank's assets, under contract requiring transferee banks to pay in full claims of depositors shown by bank's books, held in effect an assignment for benefit of creditors.**

Where assets of bank sought to be liquidated were transferred to other banks under a contract requiring transferee banks to pay in full the claims of depositors, are shown by books of bank, transaction was in effect an assignment for benefit of creditors.

**7. Assignments for benefit of creditors ☜118—Validity of preferences under assignment for creditors is governed by law of state where parties reside and subject-matter is located.**

Where the parties to an assignment for benefit of creditors reside, and the property which is the subject-matter thereof is located within the state where the assignment is made, the validity of preferences thereunder is governed by the law of that state.

**8. Corporations ☜544(1)—In Virginia, prior to 1924, it was permissible for insolvent corporation to prefer a creditor (Code Va. 1924, §§ 3810, 5278b–5278d).**

Under the law of Virginia prior to the enactment of Code Va. 1924, §§ 5278b–5278d, it was permissible to prefer creditors, even where the preference was given by an insolvent corporation, and this rule was not affected by section 3810, preventing extinguishment of corporation debts by dissolution.

**9. Banks and banking ☜57—Directors of liquidating bank held not liable for unintended preference to depositors paid in full over depositors claiming loss through fraudulent collusion of bank employees and depositors' employee.**

Where assets of apparently solvent bank were transferred to other banks for purposes of liquidation, under contract requiring latter to pay in full the claims of depositors as shown by books of liquidating bank, without any knowledge on part of liquidating bank's officers and directors of fraud which had been perpetrated on complaining depositors by collusion of bank's cashier and bookkeeper with complainants' local manager, which made bank insolvent, and without intending any preference, *held*, that directors were not liable in damages for the unintended preference resulting; complainants' remedy being to file a bill to surcharge and falsify their accounts as they appeared on books of bank, and to subject assets in hands of transferee banks to payment of their accounts as so corrected ratably with other depositors.

**10. Banks and banking ☜64—Depositors not asserting claims for loss from fraud of their local manager and bank employees until 2½ months after completion of bank's liquidation held estopped to question validity of liquidation.**

Where assets of bank were transferred to other banks for liquidation under contract requiring latter to pay in full claims of depositors as disclosed by books of liquidating bank, depositors, sustaining loss through fraud of their local manager, acting in collusion with bank's cashier and bookkeeper, who stood silently by for 5 months with knowledge of the facts, and allowed contract to be carried out and assets to be distributed, *held* estopped from questioning the validity of the contract or the propriety of the distribution thereunder 2½ months after such distribution, in application of rule that one silent when bound to speak will not be permitted to speak when it is his duty to be silent.

**11. Banks and banking ☜57—Bank president's liability to depositors depends on whether he would be liable for loss of bank or its creditors.**

Bank president's liability to depositors for knowingly permitting personal checks of corporate depositors' local manager to be charged to corporate depositors' account depends on whether president was guilty of such negligence as would subject him to liability for the loss sustained by the bank or its creditors.

**12. Banks and banking ☜138—Bank should not charge agent's personal checks to principal's account without principal's authorization.**

A bank has no right to charge one man's check to the account of another without the permission of the other, and should not charge personal checks of an agent to the account of his principal without authorization of the principal.

**13. Banks and banking ☜116(3)—That bank employees handled checks of corporate depositors' local manager held to put bank on notice that he was not corporate depositor, as he represented.**

That bank employees handled checks of foreign corporation's local manager, which were sent to foreign corporation's office in another state, was sufficient to charge bank, as a corporation, with notice that local manager was not the *corporate depositor*, as he informed bank's president that he was.

**14. Banks and banking ⚬57—Notice to banking corporation's employees was notice to corporation, but not to its officers and directors.**

Notice to the employees of a banking corporation was notice to the corporation, but not to its officers and directors.

**15. Banks and banking ⚬138—Depositor can deposit funds in a trade-name and authorize individual checks to be charged against such deposit.**

A depositor can deposit funds in a trade-name as well as in his individual name, and can authorize his individual checks to be charged against the funds deposited in the trade-name, for it is a matter of contract between the bank and depositor as to how checks shall be signed and against what account they shall be charged.

**16. Banks and banking ⚬57—Bank president held not liable for permitting personal checks of depositor's local manager, clothed with apparent ownership of business, to be charged to depositor's account.**

Where corporate depositor's local manager, clothed with apparent ownership of the business, informed president of bank, on inquiry by president, that he was the company, and directed that his personal checks should be charged to corporation's deposit account, bank president *held* not chargeable with negligence, so as to make him liable for loss resulting from carrying out the direction, in absence of any knowledge putting him on inquiry, notwithstanding bank cashier and bookkeeper had knowledge of facts and acted in collusion with local manager in perpetrating the fraud.

**17. Banks and banking ⚬57—Corporate depositor held estopped to assert bank president's negligence as ground for president's liability for loss through its local manager's fraud.**

Where bank sent statements to local office of depositor, a foreign corporation, showing that personal checks of depositor's local manager were charged to corporate depositors' account, and this practice continued for many years, *held*, that depositor was estopped by its own negligence from seeking to recover for loss sustained from bank's president, on ground of his negligence in permitting checks to be so charged, since by failing to check its manager's accounts properly it enabled him to mingle its account with his own and to consummate fraud, in application of maxim that, where one of two innocent persons must suffer, he who has enabled the third person to occasion the loss must sustain it.

**18. Appeal and error ⚬1022(1)—Finding of special master, approved by District Court, will not be disturbed on appeal, unless clearly wrong.**

Findings of fact of special master, approved by District Court, will not be disturbed on appeal, unless such finding is clearly wrong.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit by the Cory Mann George Corporation and others against the Commercial Exchange Bank of Norfolk and others. Decree for plaintiffs against defendant Bank only. From that portion of the decree which discharged the other defendants from liability, complainants appeal. Affirmed.

Edward R. Baird, Jr., of Norfolk, Va., and Ernest E. Baldwin, of New York City (Baldwin & Barns, of New York City, and Baird, White & Lanning and J. P. Jackson, all of Norfolk, Va., on the brief), for appellants.

Luther B. Way, of Norfolk, Va. (Pender, Way & Foreman, of Norfolk, Va., on the brief), for appellees.

Before PARKER and NORTHCOTT, Circuit Judges, and HAYES, District Judge.

PARKER, Circuit Judge. This was a suit instituted by the Cory Mann George Corporation, Norton, Lilly & Co., and the Northern Coal Company, in behalf of themselves and other creditors similarly situated, against the Commercial Exchange Bank of Norfolk, its officers and directors. The purpose of the suit was to recover for funds of complainants deposited in the bank and fraudulently misappropriated by their Norfolk manager, one Arthur C. Odend'hal. It was alleged that the bank was liable for Odend'hal's misappropriations, because, through his collusion with the cashier, one Glennan, he had been allowed to draw out for his own use funds belonging to the companies which he represented. Liability of the directors was asserted on the ground of negligence in the management of the bank, and also on the ground that while the bank was insolvent they had transferred its assets to the associated banks of Norfolk and Portsmouth, under a contract providing that from these assets the associated banks should pay in full the claims of depositors as they appeared upon its books, which did not show the claims of complainants based upon the wrongful withdrawals of Odend'hal. One H. L. Page, who had formerly been a director of the bank, was later made a party to the suit, and an amendment to the bill was filed, alleging as additional ground of liability on his part that he had authorized the personal checks of Odend'hal to be charged against the account of the Northern Coal Company.

The case was referred to a special master, and on the coming in of his report a decree was entered against the bank, Odend'hal, and Glennan for $9,442.92 in favor of the Northern Coal Company, and for $57,493.61 in

favor of the Cory Mann George Corporation, the latter amount including the $15,000 involved in the claim of Norton, Lilly & Co., to which inclusion Norton, Lilly & Co. did not and does not object. The decree discharged the other officers and directors from the liability alleged, and from that portion of the decree the complainants have appealed; the Northern Coal Company assigning as error, also, that its recovery should have been fixed at $14,758, instead of $9,442.92. No appeal was taken by the bank, Odend'hal, or Glennan, and the correctness of the decree, in so far as it affects them, is not before us.

Odend'hal, as the Norfolk manager of the Northern Coal Company and of the Cory Mann George Corporation, had complete control of the business of each of these corporations in that city. He kept a deposit account in the name of each of them in the Commercial Exchange Bank, in which he deposited funds from time to time, and against which he drew checks. He was authorized by each of them to check against its account in the transaction of its business, and in the case of the Northern Coal Company no signature other than his was required on the check. Checks on the account of the Cory Mann George Corporation were required to be countersigned by the cashier in its Norfolk office. That corporation also required that Odend'hal furnish each month a certificate of the cashier of the bank showing the balance on deposit to its credit; but no such certificate was required by the Northern Coal Company.

The fraud on the Cory Mann George Corporation was perpetrated by charging against its account checks drawn by Odend'hal individually, and by crediting to Odend'hal's individual account checks payable to the Cory Mann George Corporation and deposited for credit on its account. The fraud was concealed by having the cashier of the bank furnish a false statement of account, showing the balance of account as it should have been and as it would have been if the fraudulent transactions had not occurred. These statements were signed by Glennan, who was acting in fraudulent collusion with Odend'hal. No one else knew anything about the fraud which was being perpetrated, except the bank's bookkeeper, who aided and assisted the cashier in perpetrating it. It was carefully concealed from the other officers and directors, none of whom even suspected it. As the fraud consisted in charging or crediting to one account checks which should have been charged or credited to another, it was not a fraud which could have been detected by examination of the bank's books, and as a matter of fact these appeared to be in perfect condition.

The fraud on the Northern Coal Company was perpetrated by charging against its account checks of Odend'hal. The false certificates as to bank balances were not obtained, as this company did not require them, but true statements of the account with canceled checks were sent to Odend'hal, who was in absolute control of the business of the company at Norfolk. As in the case of the fraud on the Cory Mann George Corporation, there is no evidence that any of the officers or directors of the bank, with the exception of Glennan, the cashier, knew of Odend'hal's fraudulent misappropriations. More than two years before these misappropriations were discovered, however, there occurred an incident upon which the Coal Company bases its contention as to the liability of H. L. Page, president of the bank at that time. A personal check of Odend'hal's came into the bank which overdrew his personal account. Page called him over the telephone and notified him of the overdraft. He protested that he had thousands of dollars on deposit in the name of the Northern Coal Company. Page replied that he could not charge his checks to the account of that company. Thereupon Odend'hal stated that he himself was the Northern Coal Company, and that any check signed in the name of the company might be charged to his account, or any check signed in his name charged to the account of the company. Odend'hal then came to the bank and gave instructions to its officials accordingly. Some time later, upon instructions from him, the two accounts were combined.

It appears that Page did not know and had no reason to suspect that Odend'hal's statement was false. Odend'hal at the time was a man of the highest standing in the community. He had absolute control of the Northern Coal Company's business in Norfolk and of its funds handled there; and the company, although doing a large business in Virginia, had not domesticated as required by statute. It required no countersignature on checks signed by Odend'hal, and when statements were sent in showing his checks charged to its account no protest was made. Glennan and the bookkeeper who were in collusion with Odend'hal saw checks which he sent to the Northern Coal Company in Boston, and which were charged to its account at the bank; but Page denies that he had any knowledge of these checks, and there is no evidence that he had such knowledge.

During the four years of the bank's exist-

ence 75 meetings of the directors were held. An executive committee was appointed, and loans were properly supervised. The directors regularly audited the accounts of the cashier while the transactions complained of were occurring, making two audits in 1921 and one in 1920. In addition to this, they had examinations made once a year by certified public accountants. It appears, further, that no amount of auditing or examination could have disclosed the fraud perpetrated on complainants by Odend'hal, unless their own books had been examined at the same time as were the books of the bank; for the fraudulent entries did not disturb the balance as shown by the books, nor give indication that a fraud was being perpetrated. There is no evidence of negligence on the part of the directors in the selection of the cashier or of the bookkeeper who colluded with Odend'hal, but, on the contrary, the evidence is that they were both thoroughly competent and bore excellent reputations until involved in this fraud.

In January, 1922, the directors decided to liquidate the bank because it was not making money. At that time no claims were being made against it by complainants, and it not only appears that the directors did not know of their claims, but also that they had no intention of giving a preference to any one. The bank was thought to be perfectly solvent, and it was expected that its assets would pay all creditors in full, and pay also a large dividend to stockholders. In order that the financial situation in Norfolk might not be disturbed by the liquidation of a bank at that rather critical time, the associated banks of Norfolk and Portsmouth took over its assets, under an agreement that they would pay in full the claims of all depositors as shown by its books, and that the directors would indemnify them against loss in so doing. The associated banks proceeded to liquidate the bank under this agreement, and by the latter part of May had paid in full the claims of all depositors as shown by its books.

As early as February 12, 1922, complainants had learned the facts with regard to the claims asserted in this suit. Nevertheless they took no action to establish their right to share in the distribution of the assets which had been transferred to the associated banks, but stood by and allowed these assets to be used to pay in full the claims of other creditors. Not until more than five months after learning the facts, and nearly two months after the other depositors had been paid in full, did they file suit.

Upon the facts as stated three principal questions arise for our determination: (1) Are the directors liable on the ground of negligence in the supervision of the bank for the losses sustained by complainants? (2) Are the directors liable, because of the transfer of assets under the agreement with the associated banks, for what complainants would have received on their claims, if the assets had been distributed ratably among the claims of all creditors including theirs? And (3) is the defendant Page liable by reason of his allowing the checks of Odend'hal to be charged against the Northern Coal Company's account? We shall consider these questions in the order named.

[1, 2] The first question has been argued as though in wrongfully drawing against the accounts of complainants Odend'hal had drawn out their funds, and that the directors were liable to complainants for allowing him to do so. It is clear, however, that the personal liability of the directors, if it existed, could not rest upon this basis. When funds of complainants were deposited with the bank on general deposit, they ceased to be funds of complainants, and became the property of the bank, and the bank thereupon became a mere debtor of complainants for the amount of the deposits. When, therefore, funds were thereafter paid out on checks which were improperly charged to the accounts of complainants, this does not mean that funds of complainants, but funds of the bank, were improperly paid out, and, so far as complainants are concerned, merely that improper charges were made against their accounts. Likewise the crediting of deposits to the wrong account did not impair the rights of the real depositor against the bank; but the paying out of funds on checks drawn against the account to which they were improperly credited was an improper diversion of the funds of the bank, and not of the depositor. The rights of the complainants to their deposits in the bank were not affected by the wrongful charges and credits, which merely concealed the wrongful diversion of the funds of the bank. Their right to recover on account of the negligence of the directors depends, therefore, upon their ability to show that their loss as depositors was due to the losses of the bank, and that these occurred through the negligence of the directors.

[3] There is no trouble about the law applicable to this branch of the case. Directors are not insurers, nor are they technically trustees. They are agents of the corporation, charged with the supervision of its business, and, as such, bound to use that degree of care

which ordinarily prudent and diligent men would exercise under similar circumstances. Briggs v. Spaulding, 141 U. S. 132, 11 S. Ct. 924, 35 L. Ed. 662; Bates v. Dresser, 251 U. S. 524, 40 S. Ct. 247, 64 L. Ed. 388; Williams v. Fidelity Loan & Savings Co., 142 Va. 43, 128 S. E. 615, 45 A. L. R. 664. The rule as to their liability is well stated by Chief Justice Fuller in the case of Briggs v. Spaulding, just cited, as follows:

"The degree of care required depends upon the subject to which it is to be applied, and each case has to be determined in view of all the circumstances. They are not insurers of the fidelity of the agents whom they have appointed, who are not their agents but the agents of the corporation, and they cannot be held responsible for losses resulting from the wrongful acts or omissions of other directors or agents, unless the loss is a consequence of their own neglect of duty, either for failure to supervise the business with attention or in neglecting to use proper care in the appointment of agents. Morawetz, § 551 et seq., and cases."

[4] Applying that rule to the facts of this case, we do not see how the loss occasioned by the wrongful payment of Odend'hal's checks, or by the wrongful crediting to him of deposits belonging to the Cory Mann George Corporation, can be said to have resulted from any negligence of the directors. It was, of course, a wrongful act on the part of the cashier to pay out the money of the bank to Odend'hal in this way; but the directors did not authorize it, and so far as we can see they did not leave undone anything which they should have done by which it might have been prevented. It is argued that they should have called in the passbooks of the customers and had them checked with the books of the bank; but, if this had been done, it is not certain, or even likely, that the fraud would have been prevented or discovered. The cashier and bookkeeper, who made false entries and certified to false statements of account, would certainly not have revealed the discrepancy between the books of the bank and the books of complainants, nor is it likely that they would have allowed the checking to be done by one who would have discovered it.

[5] And we do not think that the directors should be held negligent and mulcted in damages for failure to adopt what in this day would be an unusual precaution. The modern practice of banks is not to check passbooks, but to send to the depositor statements of account, with his canceled checks or vouchers. The self-interest of the depositor can ordinarily be depended upon to protest against the charging of checks of other persons against his account; and we do not think that the directors were guilty of negligence because they did not foresee that what would ordinarily be a sufficient safeguard would be circumvented by the collusion between their faithless cashier and the faithless manager of complainants. As said by Judge Wallace in Warner v. Penoyer (C. C. A. 2d) 91 F. 587, 44 L. R. A. 761:

"They are not to be deemed remiss because they did not resort to exceptional methods, or because they relied on the cashier's supervision over the books and accounts, or because they reposed confidence in his reports of the amount and other clerical details of the assets and liabilities. They were under no duty to observe the extraordinary vigilance short of which a bank cannot be protected from the crimes conceived by a dishonest cashier."

In a case very similar to this, in that it involved falsification of the deposit ledger by a bookkeeper of the bank, the Supreme Court of the United States held that the directors should not be held answerable for taking the cashier's statement of liabilities to be correct, or for not calling in the passbooks of customers and comparing them with the ledger of the bank. Bates v. Dresser, 251 U. S. 524, 40 S. Ct. 247, 64 L. Ed. 388.

We have studied carefully, not only the report of the special master, but also the evidence in the case, and we are satisfied therefrom that the directors exercised reasonable care in their supervision of the bank, and that there is no evidence of failure on their part to measure up to the standard of the reasonably prudent man prescribed by the law. We are satisfied, also, that the loss which resulted from the fraudulent conduct of Odend'hal and the cashier could not reasonably have been foreseen or prevented by the directors, and therefore could not be said to have been caused by any lack of care on their part, even if there had been lack of care in other respects. In other words, the evidence does not establish negligence, nor does it show that the acts or omissions relied upon as being negligent were the proximate cause of complainants' loss.

[6] On the second question the contention of complainants is that the directors are liable to them for what they would have received on their claims, if the assets of the bank had been distributed ratably among the creditors, instead of having been transferred to the associated banks of Norfolk and Portsmouth under a contract which provided that claims

of depositors as shown by the books should be paid in full. They take the position that, when their claims are counted among its liabilities, the bank was insolvent at the time of the transfer; that the transfer was made in anticipation of a dissolution of the corporation; that under such circumstances the assets constituted a trust fund for the payment of all creditors; that the transfer under the contract with the associated banks was a preference in favor of creditors whose claims were shown by the books of the bank; and that for transferring the assets so as to create such preference the directors are liable to complainants in damages.

[7] It is perfectly clear that the directors had no idea of preferring any creditor of the bank in the contract made with the associated banks. They supposed that the obligations of the bank were correctly set forth on its books, and their sole purpose was to provide that every creditor of the bank should be paid in full. If, however, it had been intended to prefer the creditors whose claims appeared upon the books, there can be no doubt that under the law of Virginia, as it existed at that time, such a preference would have been valid. This is not a proceeding in bankruptcy, nor does it involve the question as to how a federal court will distribute assets of an insolvent corporation among its creditors in administering a receivership. The transfer of assets under the contract with the associated banks was in effect an assignment for the benefit of creditors. Cobb v. Interstate Mortgage Corp. (C. C. A. 4th) 20 F.(2d) 786; Moore v. Triplett, 96 Va. 603, 32 S. E. 50, 70 Am. St. Rep. 882; Wolf v. McGugin, 37 W. Va. 552, 16 S. E. 797; 5 C. J. 1036. And where the parties to an assignment reside and the property which is the subject-matter thereof is situate within the state where the assignment is made, there can be no doubt that the validity of preferences thereunder is governed by the law of that state. Peters v. Bain, 133 U. S. 670, 679, 10 S. Ct. 354, 33 L. Ed. 696; Barnett v. Kinney, 147 U. S. 476, 13 S. Ct. 403, 37 L. Ed. 247; South Branch Lumber Co. v. Ott, 142 U. S. 622, 12 S. Ct. 318, 35 L. Ed. 1136; Robinson & Co. v. Belt, 187 U. S. 41, 23 S. Ct. 16, 47 L. Ed. 65; Talley v. Curtain (C. C. A. 4th) 54 F. 43.

[8] The law applicable in this case, therefore, is the law of Virginia; and it is settled that under the law of that state prior to the enactment of the statute of 1924 (title 46a of the Code of Virginia, sections 5278b–5278d) it was permissible to prefer creditors, even where the preference was given by an insolvent corporation. Planters' Bank v. Whittle, 78 Va. 737; Beck v. Semones' Adm'r, 145 Va. 429, 436, 134 S. E. 677; Peters v. Bain, supra. See, also, 2 R. C. L. 694, and cases cited, and 19 A. L. R. 321 et seq. And this was not affected by section 3810 of the Code; the clause relied upon by complainants being intended, not to prevent preferences, but the extinguishment of the debts of the corporation by dissolution.

[9, 10] Complainants argue, however, that, even though it be permissible to prefer creditors in an assignment, the rule has no application here, because the transfer of the assets of the bank was not intended to create a preference. But, of course, if the directors could not be held for damages if they had intentionally given a preference, they could not be held if the transfer resulted in a preference without their intending it. We quite agree with complainants that no preference was intended, and that the preference which has resulted in favor of the depositors whose claims were shown by the books was a thing which neither the directors nor the associated banks contemplated at the time of the transfer. But it does not follow that the directors are liable in damages for this unforeseen and unintended result. The remedy of complainants was to file a bill to surcharge and falsify their accounts as they appeared upon the books of the bank, to correct the mistake in the contract with the associated banks, and to subject the assets in the hands of the associated banks to the payment of the accounts as so corrected ratably with those of other depositors. Having stood silently by with knowledge of the facts, and allowed the contract to be carried out and the assets to be disbursed in paying in full the claims of other depositors, they are estopped now to question the validity of the contract or the propriety of the distribution of the assets thereunder. If they intended to complain of the disposition of the assets under the contract, they should have done so while there was yet time for the mistake of the directors to be corrected and a ratable distribution to be made. "If a man is silent when it is his duty to speak, he shall not be permitted to speak when it is his duty to be silent." Bispham's Principles of Equity (7th Ed.) par. 284; Morgan v. Railroad Co., 96 U. S. 716, 24 L. Ed. 743.

[11] The third question relates to the liability of H. L. Page for permitting the checks of Odend'hal to be charged to the account of the Northern Coal Company. The same observation applies here that was made in the beginning of the discussion of the first ques-

tion, viz.: That the wrongful payment on the checks of Odend'hal did not dissipate the funds of the Northern Coal Company, but of the bank; and the only question is whether Page was guilty of such negligence in allowing the checks to be paid as would subject him to liability for the loss sustained by the bank or its creditors. We think that this question must be answered in the negative.

[12, 13] Of course, a bank has no right to charge one man's check to the account of another without the permission of the other; and it is clear that a bank should not charge the personal checks of an agent to the account of his principal without authorization of the principal. It is also clear that the fact that employees of the bank handled checks of Odend'hal which were sent to the Northern Coal Company in Boston was sufficient to put the bank as a corporation on notice that he was not the Northern Coal Company, as he contended that he was. But the question here does not turn on any of these matters, but on whether Page was guilty of negligence as an officer of the bank in trusting Odend'hal's statement and complying with his directions. We do not think that he was.

[14, 16] Notice to the employees of the corporation was notice to the corporation, but not to its officers and directors. Perth Amboy Gaslight Co. v. Middlesex County Bank, 60 N. J. Eq. 84, 45 A. 704, 709; Washburn v. Inter-Mountain Mining Co., 56 Or. 578, 109 P. 382, Ann. Cas. 1912C, 357; Wallace v. Lincoln Savings Bank, 89 Tenn. 630, 15 S. W. 448, 24 Am. St. Rep. 625; 4 Fletcher, Cyclopedia of Corporations, par. 2258. Page, therefore, was not charged with notice that Odend'hal had been sending checks to the Northern Coal Company in Boston. He had no knowledge of these checks, and no reason to doubt Odend'hal's statement that he was the company. Odend'hal was a man of high character and standing in the community. He had been clothed by the Northern Coal Company with apparent ownership of its business. The funds of that company were deposited in the bank by Odend'hal and drawn out by him. He was apparently the depositor, being allowed by the coal company to handle its funds without restraint, as though they were his own. When, therefore, he told Page that he was the Northern Coal Company, and that checks signed by him individually should be charged to the account of the company, the situation presented is not that of one known to be the agent of another, who directs that his checks be charged to the account of his principal, but

of one who is in charge of a business which he claims to own, and who directs what checks shall be charged against its account.

A depositor can deposit funds in a trade-name, as well as in his individual name, and can authorize his individual checks to be charged against the funds deposited in the trade-name; for it is a matter of contract between the bank and the depositor as to how checks shall be signed and against what account they shall be charged. Polizzotto v. People's Bank, 125 La. 770, 51 So. 843, 30 L. R. A. (N. S.) 206; First Nat. Bank of Mishawaka v. Stapf, 165 Ind. 162, 74 N. E. 987, 112 Am. St. Rep. 214, 6 Ann. Cas. 631, and note at page 632; 3 R. C. L. 542; Pierson v. Union Bank, etc., Co., 181 Ky. 749, 205 S. W. 906, 2 A. L. R. 172, and note. Under the circumstances of the case, therefore, we do not think that Page was guilty of negligence in relying upon the statement of Odend'hal, or in allowing the checks to be charged as directed by him. We must view what he did in the light of the circumstances as they appeared to him at the time, and not in the light of subsequent developments; and, when so viewed, we cannot say that he failed to exercise reasonable prudence.

[17] And we think, too, that the coal company is estopped by its own negligence in dealing with Odend'hal from relying upon the alleged negligence of Page as ground of liability. It appears that the bank sent statements of the coal company's account to its Norfolk office showing the checks of Odend'hal which had been charged against it. This went on for months and years, and no protest was made by the coal company. By intrusting its funds to Odend'hal without check or restraint, it enabled him to treat them as his own. By placing him in absolute control of its business, it enabled him to pose as the owner of that business. By failing to check his accounts properly, it enabled him to mingle its account with his own. And by failing to supervise his office, and protest when his checks were charged against its account, it enabled this practice to continue until a loss was sustained which in all probability would have been averted if timely protest had been made. Whatever might be the rights of other claimants, it does not lie in the mouth of this complainant, after failing to domesticate in Virginia and clothing Odend'hal with apparent ownership of its business and funds, to say that Page should not have trusted him or believed him when he asserted that ownership. Where one of two innocent persons must suffer by the acts of a third, he who has enabled such third

person to occasion the loss must sustain it. [13] There is one other point in the case, but it requires only brief notice. The coal company claims that the decree in its behalf should be for $14,750.80, instead of for $9,442.92. The bill of complaint alleged that certain checks amounting to $22,731 had been wrongfully charged to the account of the coal company, but that part of this sum had been repaid, leaving a balance of $17,-395.22. It developed that one of the checks, in the sum of $7,962.30, was wrongfully included in the list sued on, as it was payable to the coal company, and that company had received the cash on it. The special master deducted this check from the $17,395.22, and we think that he was correct in so doing. It appears, furthermore, that the special master carefully went over the account and checks in arriving at the amount due, and his finding with respect thereto was approved by the judge in the court below. The rule is well settled that we will not disturb such a finding unless it is clearly wrong.

There was no error and the decree entered in the District Court is affirmed.

Affirmed.