## BURCKHARDT v. NORTHWESTERN NAT. BANK et al.

## BALLIN v. SAME.

### No. 5874.

Circuit Court of Appeals, Ninth Circuit.
Feb. 24, 1930.

William C. Bristol, of Portland, Or., for appellants.

Chas. A. Hart, Alfred A. Hampson, Robert F. Maguire, and John F. Logan, all of Portland, Or., for appellees other than Olmstead.

Carey & Kerr, Dey, Hampson & Nelson, and Winter & Maguire, all of Portland, Or., for appellees.

Before DIETRICH and WILBUR, Circuit Judges, and LOUDERBACK, District Judge.

## LOUDERBACK, District Judge.

Each of the instant suits was instituted by a stockholder of the Northwestern National Bank of Portland, Or., in behalf of himself and the other stockholders, against the bank and its directors, to enjoin respondents from proceeding with the collection of the indebtedness of the appellants to the bank, to require an accounting of all financial transactions of the bank, to have the court make a finding to what extent and who shall be held and adjudged liable for the losses and impairment sustained by the complainant and all other stockholders of the bank.

The defendant McCormick appeared specially in these suits to have them dismissed as to him, on the ground that the court had no jurisdiction over him, since he was served with the process in and was a resident of the state of Illinois. His motion to dismiss was granted.

Decrees dismissing the bills of complaint on the ground of the failure of the plaintiffs to establish the facts alleged in the bills of complaint were granted by the trial ·court. Appeal was then taken to this court from these decrees by the two stockholders to whom we will hereafter refer as the appellants.

The Northwestern National Bank was organized in 1912, and began business on January 2, 1913, with an original capital of $500,000 and a surplus of $100,000, which capital and surplus, by successive increases, the last of which took place in July, 1922, became capital of $2,000,000 and surplus of $400,000. Henry L. Pittock was the first president of the bank, and remained president until his death in 1919, when Emory Olmstead became president. He continued as such until his resignation on February 28, 1927, when he was succeeded in office by O. L. Price.

In 1915 the bank had deposits of approximately $5,000,000. Within two years thereafter these deposits had practically doubled, and by 1920 its deposits had increased to $28,000,000. It was paying dividends until 1920, when a general period of deflation began. From the peak of deposits in 1920 of $28,000,000, within two years, the deposits dropped to $16,000,000. In 1920 the loans of the bank were $19,000,000. In March, 1927, the bank was sold to the First National Bank and the United States National Bank of Portland, Or., to meet the emergency which arose when the Northwestern National Bank was unable to meet a run upon it by its depositors.

The gist of the bills of complaint is alleged inattention to and mismanagement of the bank by its directors which resulted in the "destruction" of the bank. The evidence of the appellants tended to show: The directors were trustees of the bank, and as such were inattentive to their duties and failed to act until an emergency had arisen. As early as 1922 the national bank examiners called the attention of the directors to the fact that slow assets, doubtful assets, bad debts, known as frozen assets and overdue paper, were being carried by the bank, which were considered by the examiner undesirable, and urged that they be taken care of.

In the board of directors, three plans were suggested and worked upon for the stabilization of the bank, but were negligently allowed to lapse unaccomplished. The first plan was for the organization of a corporation among the stockholders of the bank, which corporation would buy out the "frozen" assets of the Northwestern National Bank. This plan was under consideration by 1926, and the stockholders subscribed the $750,000 the plan called for. Then in the early part of 1927, a second plan was considered which was for the formation of a state bank which would take over the assets of the national bank, upon obtaining subscriptions for a $2,000,000 capital for such state bank. The third plan was for a 100 per cent. assessment of the stockholders of

the Northwestern National Bank, to secure enough money to meet its obligations.

The directors knowingly allowed checks of the Telegram Publishing Company, Wheeler Estate, Wheeler Timber Company, the McCormick Lumber Company, all of which were indorsed by J. E. Wheeler, and of J. E. Wheeler personally, and approved by the president, Mr. Olmstead, to be cashed, although there were no funds in the name of the drawer in the bank to cover them. This practice started in 1926 and continued until February, 1927, by which time the checks amounted to $800,000.

The directors Olmstead, Skinner, Stewart, and Price and employees of the bank Hoyt, Brown, Decker, Ringsred, Fraley, and Horstman were conversant with the facts concerning the Wheeler checks as early as 1926. The above employees testified of their own knowledge, and the testimony of Bates was that he had discussed the facts of the Wheeler checks with the above-named directors in 1926. The records of the bank were open to the directors, and such records disclosed these transactions. Wheeler was unable in 1927, when the demand was made, to cover these checks. Wheeler was the owner of the Telegram Publishing Company, and stated he had a buyer for this company for $900,000, and expressed a willingness to turn over sufficient of the proceeds of such sale to the bank to meet the loss from such checks; but nothing was done to press Wheeler to accept the offer and make the sale.

As early as 1923 a plan for the sale of the Northwestern National Bank to the United States National Bank and the First National Bank had been under discussion, was allowed to lapse, only being revived during the emergency of 1927.

The management of Mr. Olmstead, the president, was known to be unsatisfactory, and his removal was discussed as early as 1923, but he was allowed to retain the presidency and management of the bank until 1927 before he was removed because of his mismanagement.

The directors of the bank had a statement published on March 2, 1927, in a Portland newspaper, to the effect that the bank was in good condition, whereas conditions were so serious that on March 29, 1927, the sale of the bank occurred. Furthermore, the sale was entered into without the prior consent of the stockholders.

The evidence of the defendants, to whom we will hereafter refer as the respondents,

tended to show: Until 1920 the deposits grew enormously, reaching the sum of $28,000,000, and it was during this period of extremely rapid growth that most of the loans were made out of which there later grew enormous losses. These loans, when made, were supported by sufficient margin. All were made in early prosperous days of the bank. 1920–21 there was a heavy deflation in property values which wiped out margin and left loans not adequately secured, and these became frozen assets. When the deposits fell from $28,000,000 in 1920 to $16,000,000 in 1922, the bank had to meet a withdrawal of deposits of $12,000,000, and loans had to be collected where it was possible to effect speedy collection, with the result that the best notes were called and the slow loans, which could not be speedily collected, accumulated. The bank found itself with a frozen loan account of the proportion that might be expected in a bank with $28,000,000 in deposits, but now, with deposits of but $16,000,000, its earning capacity was limited by the amount of its deposits, and upon the $16,000,000 of deposits it was required to earn enough to absorb the losses that had been developed under unusual conditions of depression following the World War, in a bank almost twice as large. The resulting condition was a very serious one. The directors attempted to meet this situation, and stopped the payment of all dividends after 1920, and all earnings of the bank, amounting to $150,000 to $200,000 a year, from this time on were credited to the profit and loss account. All loans recommended to be charged off by the bank examiners were so charged off by the directors. The efforts at co-operation of the directors with the bank examiners is reflected in the reports of the deputy comptrollers as follows: On July 11, 1924, Deputy Comptroller Mr. McIntosh stated "that both officers and directors appear to be doing everything possible to remedy conditions." and the report of Deputy Comptroller E. W. Stearns, on April 19, 1925, stated that "the management is working earnestly to improve the bank's condition."

The directors themselves testified that they met regularly and exercised their best judgment, after due deliberation, on the issues coming before them, but, despite the use of the earnings to pay off the paper to which the bank examiners objected, the losses continued to accumulate, due to the continued depression of the securities for such paper. Therefore the necessity arose of devising

some means to remove these depreciating securities.

In 1925 the first plan was devised to relieve the situation, and this plan called for the formation of a corporation among the stockholders of the bank for the purpose of purchasing as much as possible of the so-called frozen assets. Mr. Metschan, a member of the examining committee, Mr. Stewart, vice president and the person designated by the directors to devise means to handle the frozen asset situation, and Mr. Price, vice president and chairman of the board of directors, went to Washington to discuss the matter with the Comptroller, who tentatively approved the plan which called for a cash payment of $750,000 and subscription for $1,500,000. The Comptroller reserved the right to finally pass upon this plan after an examination by the national bank examiners to be had in 1926. Meanwhile the directors interviewed the stockholders and enlisted their support. The national bank examiner's report of December, 1926, approved the plan, and at a conference at San Francisco, between Price, Stewart, the Comptroller, and Chief Examiner Harris, the plan was approved by the Comptroller. Between this date, December, 1926, and February 2, 1927, the directors were busy attempting to get stockholders to make their subscriptions. But in February of 1927 the directors, other than Olmstead, discovered the abstraction of the $800,000 by the unsecured Wheeler checks, cashed by the bank with the approval of Olmstead. Upon the discovery of these facts, this plan had to be abandoned, since the $750,000 to be raised and called for by the proposed plan to charge off the frozen assets would no longer have been sufficient with this additional $800,000 shortage.

The second plan was then formulated by the directors, which was the organization of a new bank under the laws of the state of Oregon, with $2,000,000 capital to purchase the business of the Northwestern National Bank. This was in February, 1927. This money was subscribed, but it was decided by the directors that the plan was impracticable, since the publicity involved would cause a loss of public confidence, and they would be unable to draw on the Federal Reserve Bank for money, and the sum of $1,500,000 due the Federal Reserve Bank would have to be repaid if the Northwestern National Bank was liquidated.

The third plan was then decided upon by the directors, which called for a 100 per cent. assessment, which it was believed would require little publicity. The Northwestern National Bank could continue under its old charter. The money subscribed under the second plan was to be used under this plan. At this time, however, a run started upon the Northwestern National Bank, and in five days the bank was unable to meet the run, and the sale of the bank was made.

In March and April, 1926, the attention of the board of directors was called to the fact that there were in the cash items of the bank, returned checks of $47,000 deposited to the account of J. E. Wheeler. But they were informed by the examiner that during the course of the examination these checks had been taken care of. Jones, Skinner, Stewart, Price, Metschan, and Spaulding testified that it was not until February, 1927, that they knew anything at all about the Wheeler checks being cashed without any money to cover them. Price's attention was called to the matter the early part of February, 1927, and he immediately called a meeting of the directors to discuss the situation. After this time no more checks were honored. Upon investigation by the directors, it was discovered that the Wheeler checks were carried as cash items, and injected into the business just at the closing time daily as items too late to collect. Because of this, not even the national bank examiners discovered the situation, though it existed since 1926. At the meeting called by Price to consider methods of meeting the $800,000 Wheeler deficit, Wheeler said he would undoubtedly shortly be able to make a sale of the Telegram Publishing Company, of which he was the owner, the proceeds of which he would use to cover this shortage. Mr. Price told Wheeler that he did not have time to make sales, he would have to arrange to get that money quickly some other way, and this was the time to call on his family. He arranged to take up the matter with his brother, William, who was then in San Francisco, and it was arranged that this brother should come to Portland for a conference on this matter.

The sale of the bank was discussed in 1923, with representatives of the United States National Bank and the First National Bank. Negotiations with the United States National Bank were not pressed because the negotiations with the First National Bank were progressing more rapidly. Further, as the negotiations proceeded, the First National Bank refused to purchase unless, in addition to the assets of the bank, a

fund of $2,250,000 in cash were deposited to protect the bank; the directors, not being able to produce such a cash deposit, abandoned the plan.

Though the removal of Mr. Olmstead was discussed in June, 1926, the Comptroller, at Washington, agreed with the view that Mr. Olmstead should be retained as president until consummation of the plan to form the corporation which was to buy the slow assets, since he was best equipped to explain the necessity to the stockholders, as he had sold most of the stock to them. That plan was not abandoned until February, 1927, when the discovery was made of the Wheeler checks. Mr. Olmstead was then forced out of his position as president on February 28, 1927.

The publication of the statement to the effect that the bank was sound, the respondents contended, was made in an attempt to offset the effects of rumors following upon the resignation of Olmstead, and to prevent a crisis in the affairs of the bank.

The bank was sold as a last measure to protect the depositors, and only after a very serious run on the bank had started. The Portland Clearing House Association refused to stand behind the bank. The Northwestern National Bank was unable to meet the run, while the purchasing banks, the First National Bank and the United States National Bank, were financially able to meet it. The sale was made on March 29, 1927, coupled with an agreement to call a meeting of stockholders to ratify the same. Under the terms of the sale, there was an assumption by the purchasers of the deposit liability of the Northwestern National Bank. The $1,000,000 collected under the assessment plan was turned over to the purchasers along with an agreement that the stockholders of the Northwestern National Bank pay another $1,000,000 immediately. The Pittock Estate and the directors individually guaranteed another $2,000,000 and further agreed that the stockholder's liability was to remain unaffected. On March 31, 1927, the notice was mailed to the stockholders, of the meeting to consider the ratification of the sale of the Northwestern National Bank. The meeting was held as called, in May, 1927. 16,955 shares were represented, and 16,915 shares, or more than two-thirds of the shares, voted to adopt the resolution affirming the sale.

The appellants placed great reliance upon sections 5147 and 5239 of Revised Statutes of the United States (12 USCA §§ 73, 93). Section 5147 provides that "each director, when appointed or elected, shall take an oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate or willingly permit to be violated any of the provisions of this title." Section 5239 provides: "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, * * * every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

These sections express a responsibility for willfully and knowingly doing the acts set forth in their provisions. In conformity with these provisions, and enlarging the scope of responsibility, the duties of directors have been determined as follows: Directors owe a duty of managing the corporation affairs honestly and impartially in behalf of the corporation and all the stockholders. Doherty v. Rice (C. C.) 186 F. 204. To render directors or other officers of a corporation liable to it for the fraudulent and wrongful acts of other officers, they must have participated therein, or else they must be chargeable with culpable negligence. Briggs v. Spaulding, 141 U. S. 132, 11 S. Ct. 924, 35 L. Ed. 662. They are liable for losses of the corporation caused by their willful and intentional departure from duty, their fraudulent breaches of trust, their gross negligence, or their ultra vires acts. They are not liable for losses happening through mere mistake of judgment. Briggs v. Spaulding, supra; Cory Mann George Corporation et al. v. Old et al. (C. C. A.) 23 F.(2d) 803. The measure of care required is ordinary and reasonable care such as a reasonably prudent, careful, and industrious man exercises in the conduct of his own affairs. Corbett v. Woodward, 6 Fed. Cas. No. 3223. A director is liable only for his own acts or omissions; he is not, merely by virtue of his position, liable for mismanagement or defalcation of officers, or employees, unless he fails to exercise a reasonable supervision of the affairs of the corporation with a degree of care which an ordinarily prudent man would exercise under similar circumstances. Gamble v. Brown (C. C. A.) 29 F.(2d) 366; Briggs v. Spaulding, supra.

The question of what constitutes negligence or due care is a question of fact to be determined according to the circumstances of each particular case. See Rankin v. Cooper (C. C.) 149 F. 1010; Bates v. Dresser, 251 U. S. 524, 40 S. Ct. 247, 64 L. Ed. 388; Bowerman v. Hamner, 250 U. S. 504, 39 S. Ct. 549, 63 L. Ed. 1113; Martin v. Webb, 110 U. S. 7, 3 S. Ct. 428, 28 L. Ed. 49.

In view of the evidence produced before the trial judge and the law which governs the standard of conduct for a director, it appears that the trial court acted within the bounds of its authority in finding that the appellants failed to establish the allegations of the bills of complaint, and that the bills of complaint were without equity.

The defendant McCormick was a resident of Illinois. Process was served upon him in the state of Illinois. He appeared specially herein in the District Court of Oregon to quash the service and to dismiss the suits as to him. His objection was not as to the jurisdiction of the court as to the subject-matter, but to the jurisdiction as to himself; the objection being to the venue.

The issue presented arises under section 51 of the Judicial code (28 USCA § 112), and comes up under its general provisions, since the exceptions under that section refer to states containing more than one division, or where receivers are appointed of lands or other property of a fixed character, or suits to enforce legal or equitable liens upon or claims to, or to remove an incumbrance or cloud upon the title of real or personal property within the district in which the suit is brought. The suits herein do not involve any of these exceptions, but are suits distinctly in personam, and are therefore governed by the general provisions of section 51.

Section 51 of the Judicial Code (28 USCA § 112), which deals with the venue of suits originally begun in the District Courts of the United States, subject to the exceptions just mentioned, provides that "no civil suit shall be brought in any district court against any person by any original process or proceeding in any other district than that whereof he is an inhabitant; but where the jurisdiction is founded only on the fact that the action is between citizens of different States, suit shall be brought only in the district of the residence of either the plaintiff or the defendant." That is to say, the suit must be brought within the district of which the defendant is an inhabitant, unless the general federal jurisdiction is founded upon the diversity of citizenship alone, in which

case it must be brought either in that district or in the district in which the plaintiff resides.

While this provision does not limit the general jurisdiction of the District Courts, it confers a personal privilege on the defendant, which he may assert or may waive at his election, if sued in some other district. Lee v. Chesapeake Railway, 260 U. S. 653, 43 S. Ct. 230, 67 L. Ed. 443, and cases cited. If this privilege is seasonably asserted, the suit must be dismissed for want of jurisdiction over the person of the defendant. Macon Grocery Co. v. Atlantic Coast Line, 215 U. S. 501, 30 S. Ct. 184, 54 L. Ed. 300; Seaboard Co. v. Chicago, Rock Island & Pacific Railway Company, 270 U. S. 363, 46 S. Ct. 247, 70 L. Ed. 633.

The plaintiff Burckhardt was a resident, at the time of the action, of the state of Washington, and the plaintiff Ballin of the state of California. The defendant McCormick was a resident of the state of Illinois. Therefore the trial court was justified in dismissing the actions as to the defendant McCormick.

The decrees are affirmed.