## HAYNES v. PIERCE et al.
### No. 4481.

District Court, W. D. Oklahoma.

Feb. 28, 1934.

Maris & Maris, of Ponca City, Okl., and Howard W. Patton, of Woodward, Okl., for plaintiff.

Cress, Tebbe & Cress, of Perry, Okl., for defendants.

VAUGHT, District Judge.

The plaintiff brings this action, as receiver of the Billings National Bank, against the defendants, as members of the board of directors of said bank, charging said directors with negligence in failing to see that the cashier was properly bonded, and also in permitting the bank to acquire $30,000 of Covington Pipe Line bonds and carrying said bonds in the assets of said bank for a period of two and a half years.

Joseph W. Back, defendant, died in February, 1933, and the cause is revived against Anna Back as executrix of his estate.

The evidence discloses the following state of facts:

Defendant Pierce is a farmer living near Billings and is living upon the same farm that he acquired in the opening of the "Strip" in 1893.

In 1904 a state bank was organized in the small town of Billings which is situated in a strictly agricultural community. This bank, after continuing as a state bank for many years, finally became the Billings National Bank, defendant Pierce continuing as a director in said banks all the while and in 1924 was president of the bank, but not feeling personally capable of operating the bank, he went to A. E. Stephenson of Enid, president of the Central National Bank, and asked for his recommendation of a good man for cashier. Defendant Chatburn was recommended by Stephenson as a competent, able, reliable, and trustworthy man for that position. At that time Chatburn was connected with a bank in Covington, and was associated with defendant Fitzgerald. A contract was entered into between Pierce, on the part of the bank, and Chatburn, whereby Chatburn became cashier of the bank, the owner of 5 shares of stock, and a director.

Defendant Adriance is an ex-soldier, was at the time of the trial 35 years of age, had been a bookkeeper in the bank and assistant cashier, and was acting cashier at the time Chatburn came into the bank. On account of his health, however, Adriance found it necessary to retire from the bank for a time, but later came back as assistant cashier.

Defendant Back was a farmer and business man in the community and had been connected with the bank for some years.

Defendant Frazier had been connected with the bank as bookkeeper and cashier, but his active connection with the bank was many years ago. At the time of the trial he was a man 73 years of age.

In October, 1924, after Chatburn came into the bank on July 1, Pierce sold to defendant Fitzgerald a controlling interest in the bank; Fitzgerald becoming a director. Fitzgerald also was president of the American State Bank at Covington, some thirty miles distant.

The evidence discloses that the management of the bank was almost entirely handled by Chatburn as cashier and Fitzgerald as a director and principal stockholder; he having in October, 1924, purchased 130 shares out of a total of 250 shares of the capital stock of the bank.

The evidence further shows that directors' meetings were held regularly every month, sometimes not exactly on the day of the month provided in their by-laws, but the meetings were held every month and the semiannual meetings on the 1st of July and the 1st of January were held approximately on those dates but with regularity. In these various directors' meetings, particularly in the semi-annual meetings, the assets of the bank were carefully gone over, the cash counted, and the usual functions of a board of directors were performed. In the monthly meetings a check of the assets of the bank was not always had, but the notes, particularly the short time notes, were checked and discussed and the ordinary duties of a board of directors were performed.

That on the 19th of October, 1926, an election was held in the town of Covington, Garfield county, Oklahoma, at which was voted $35,000 of Gas Pipe Line bonds. The bonds were to run 25 years, provided for a tax levy to meet payments for the sinking fund and interest, and the usual provisions were made that are ordinarily made for the issuance of municipal bonds. The bonds were duly executed by the proper town officials, submitted to the county attorney and county clerk of Garfield county for their approval and certificate, and were later submitted to, examined, and approved by the Attorney General of the state. Defendant Fitzgerald was the city treasurer of Covington. No contest or suit of any character questioning the validity of the said bonds was begun until October 26, 1927, at which time a suit was instituted by a taxpayer of the town of Covington in the district court of Garfield county, contesting the validity of said bonds, and alleging particularly that the election was not held in strict accordance with the statute, in that the qualified voters of the town of Covington living in Otter No. 1 were permitted to vote at the polling place in said Otter No. 1, and that any

qualified voter living in Otter No. 3 was permitted to vote at the polling place in said Otter No. 3. The voting place of each precinct in the town of Covington was regularly designated by the election officials. One of the said voting places was in Ward 1, the other in Ward 2; there was no voting place in Ward 3; and the voters in said town, offering to vote, were permitted to and did vote in said election, not according to their residence in wards, but according to their residence in precincts Otter No. 1 and Otter No. 3. No one was permitted to vote who was not a qualified voter of said town of Covington.

The said suit filed in Garfield county challenging the validity of said bonds was decided on the 26th of November, 1927, the judgment of the court being that said bonds were illegal, and the town was enjoined from negotiating said bonds or any of them. The bonds, however, had already been executed by the president of the town board and the town clerk, the proper county and state authorities, and were in the hands of Fitzgerald. In August, 1927, prior to filing the action in district court, Fitzgerald brought $25,000 of said bonds to the Billings National Bank and advised Chatburn, the cashier, that these bonds would be a good buy for the Billings National Bank. Chatburn examined the bonds, saw that they were properly executed by the town officials and had been regularly approved by the county attorney and county clerk and by the Attorney General of the state, and after checking them with Adriance, agreed to buy them at par. No discussion was had by Chatburn with any other member of the board of directors of said bank except Fitzgerald and Adriance. Later Chatburn and Fitzgerald explained to the board of directors that these bonds were good, that they had been regularly issued, and the certificate of the Attorney General of the state was attached thereto. At the time of the sale of said bonds, however, Fitzgerald reserved the right to repurchase said bonds at par, and requested Chatburn to keep the bonds in the bank at Billings because he might want some of them at any time. On January 10, 1928, he did purchase $10,000, and on March 26 he sold back to the Billings National Bank $15,-000 of said bonds. In August, 1928, Chatburn saw an article in an Enid paper in which it was stated that the bonds had been held void by the court. He talked with Fitzgerald about it, and Fitzgerald told Chatburn not to tell the other directors, and the other directors knew nothing about the questionable character of said bonds until the day the bank

closed. On October 13, 1930, Chatburn told Adriance that the Covington bonds were invalid, having been held so by the court. Adriance got in touch at once with the members of the board of directors, who immediately met, and the board decided to close the bank immediately until this matter could be straightened out. The bank was closed, and it is now the contention of the plaintiff, the receiver of said bank, that this transaction was the result of the negligence, carelessness, and failure to perform the proper duties of the individual members of the board of directors.

The defendants, with the exception of Fitzgerald and Chatburn, have answered and in their answers admit that they were members of the board of directors, but contend that as members of such board they performed the duties ordinarily performed by members of a board of directors of a national bank and in no respect did they violate the laws of the United States in failing to perform the duties exacted of them by the national banking laws.

The evidence further shows that Fitzgerald, up to the time the Billings bank closed, was regarded as a safe, successful banker and business man, and that he had the confidence of the people of the town of Covington, where he resided, and where he was president of the American State Bank, as well as city treasurer. No rumors of any suspicions or of a discrediting character, concerning Fitzgerald, had ever reached the members of the board of directors of the Billings bank.

Chatburn came to Billings with splendid recommendations, bearing the personal indorsement of Stephenson, the president of the Central National Bank at Enid, one of the outstanding bankers of the state. After coming to Billings, Chatburn at once entered into the civic life of the town, was a member of the school board, active in church work, and in civic club work. In fact, no act of Chatburn, prior to the closing of the Billings Bank, has been disclosed by the record which would cause an ordinarily prudent person to suspect any wrong doing on his part.

The bank was doing a successful business. The record discloses no evidence of bad loans, worthless paper, or any other questionable asset approved by the directors. The sole charge against the defendant directors, therefore, upon which the plaintiff urges their personal liability, is the purchase and retention of the Covington bonds, and the fact that the cashier was under only a $5,000 bond.

The statutory duty exacted of directors of

a national bank is set forth in section 93, 12 USCA (Rev. St. § 5239): "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper district, or Territorial court of the United States, in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

This statute has been construed by the appellate courts, but one of the leading cases is Briggs v. Spaulding, 141 U. S. 132, 11 S. Ct. 924, 35 L. Ed. 662. This is a lengthy opinion and is what is known as a five-four opinion, the dissenting opinion being an extended one also. I shall not quote extensively from this opinion, because counsel for both plaintiff and defendants have cited this case and quoted copiously therefrom, and I assume they are familiar therewith. However, a few quotations from this rather famous case would be appropriate. As to the duties of directors as to the management in general, the court held: "If nothing has come to the knowledge to awaken suspicion that something is going wrong, ordinary attention to the affairs of the institution is sufficient. If, upon the other hand, directors know, or by the exercise of ordinary care should have known, any facts which would awaken suspicion and put a prudent man on his guard, then a degree of care commensurate with the evil to be avoided is required, and a want of that care makes them responsible." [USCA Title 12, § 93.] As to the degree of care required, the court held: "The degree of care to which the bank directors are bound is that which ordinary, prudent, and diligent men would exercise under similar circumstances, and in determining whether such care has been exercised the restrictions of the statute and the usages of the business should be taken into account." [USCA, Title 12, § 93.] As to the delegation of duties, the court held: "The directors are not called upon to devote themselves to the details of the business management, and may properly commit these to their duly authorized officers, but they are not

absolved from the duty of reasonable supervision." [USCA Title 12, § 93.]

As to what is meant by "knowingly violate or knowingly permit," the court, in Yates v. Jones National Bank, 206 U. S. 158, 27 S. Ct. 638, 51 L. Ed. 1002, said: "Directors of a national bank who merely negligently participated in or assented to the false representations as to the bank's financial condition contained in the official report to the Comptroller of the Currency, made and published conformably to U. S. Rev. St. § 5211 [12 USCA § 161], cannot be held civilly liable to any one deceived to his injury by such report, since the exclusive test of such liability is furnished by U. S. Rev. St. § 5239 [12 US CA § 93], which makes a knowing violation of the provisions of the title relating to national banks a prerequisite to such liability."

In Thomas v. Taylor, 224 U. S. 73, 32 S. Ct. 403, 56 L. Ed. 673, the court held:

" 'The test of liability was not negligence, but the fact that the act was violated knowingly. * * * It is clear, therefore, that the words of the statute "knowingly violate, or knowingly permit to be violated," still stand as the test of civil liability. These words are not obscure or of doubtful meaning, and must be given effect in applying the statute.' * * *

"Mere negligence, without proof of an intentional violation, is insufficient to create such liability." [USCA Title 12, § 93.] Jones National Bank v. Yates, 240 U. S. 541, 36 S. Ct. 429, 60 L. Ed. 788.

In Briggs v. Spaulding, supra, the court, in the body of the opinion also said: "The evidence fairly establishes that this bank was in good credit up to the time of its failure. It had been in existence for 18 years; had been prosperous; had paid dividends regularly down to and into 1881, and its stock had for years stood far above par,—at 50 per cent. above, October 3, 1881, according to complainant. Neither the defendants, nor the bank's customers, nor the community, appear to have entertained the least suspicion as to its solvency. The losses which it is claimed rendered it insolvent, and for the recovery of which losses this action was instituted, occurred by reason of the discounting by Lee of the paper of persons engaged with him in outside business and speculations, who were not adequately responsible for their engagements. The vice in the situation lay, not in the reports nor in the books, upon their face, but in the unreliability of the bills receivable."

In Wheeler v. Aiken County Loan & Sav-

ings Bank, 75 F. 781, 784, the Circuit Court for the District of South Carolina said: "Men of extraordinary prudence and financial foresight might have foreseen the end, but directors of a small bank in a small town cannot be justly held to personal accountability for failing to select as its managers men of extraordinary gifts. Such men are rare anywhere, and it cannot be imputed as a fault to these directors that such services were not secured for the meager salaries paid to the officials of this corporation."

In Bates v. Dresser, 251 U. S. 524, 40 S. Ct. 247, 249, 64 L. Ed. 388, the court said: "We are not prepared to reverse the finding of the master and the Circuit Court of Appeals that the directors should not be held answerable for taking the cashier's statement of liabilities to be as correct as the statement of assets always was. If he had not been negligent without their knowledge it would have been. Their confidence seemed warranted by the semi-annual examinations by the Government examiner and they were encouraged in their belief that all was well by the president, whose responsibility, as executive officer; interest, as large stockholder and depositor; and knowledge, from long daily presence in the bank, were greater than theirs. They were not bound by virtue of the office gratuitously assumed by them to call in the pass books and compare them with the ledger, and until the event showed the possibility they hardly could have seen that their failure to look at the ledger opened a way to fraud."

The common-law duty is set forth in 12 USCA § 73 (Rev. St. § 5147): "Each director, when appointed or elected, shall take an oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate or willingly permit to be violated any of the provisions of this title, and that he is the owner in good faith, and in his own right, of the number of shares of stock required by this title, subscribed by him, or standing in his name on the books of the association, and that the same is not hypothecated, or in any way pledged, as security for any loan or debt. The oath shall be taken before a notary public, properly authorized and commissioned by the State in which he resides, or before any other officer having an official seal and authorized by the State to administer oaths, except that the oath shall not be taken before any such notary public or other officer who is an officer of the director's bank. The oath subscribed by the director making it, and certified by the notary public or other officer before whom it is taken, shall be immediately transmitted to the Comptroller of the Currency and shall be filed and preserved in his office for a period of ten years."

As stated above, the acts upon which the plaintiff alleges liability as to the defendants are the purchase and retention of the Covington bonds and permitting the cashier to remain under an inadequate bond.

The reports of the national bank examiner, which were introduced in the evidence, over a period of years immediately preceding the closing of the bank and prior thereto, set out the Covington bonds as assets of the bank. No complaint was made by the examiner of those bonds, neither was any exception taken by the examiner to the fact that the cashier was under a $5,000 surety bond protecting the bank against theft or embezzlement, and not for the faithful performance of his duties.

This court has never had very extensive banking experience, but his observation has been rather extended, and rarely do you find a bank in a small town, or even a large city, where the directors generally attend the meetings of the board of directors more punctually and carefully than in the case at bar. These directors testified and told how they attended the meetings, with what regularity, and what they did at these meetings, and all of the evidence in this case is to the effect that at least twice a year all of the assets of the bank were carefully checked, and in the contention of the plaintiff he does not rely upon the fact that these meetings were not regularly held and the assets regularly checked, but he contends that the grievous error was in purchasing these bonds. These bonds were voted by the town of Covington, were duly executed by the town officials as provided by the statute, were duly certified by the county attorney and county clerk, were further examined, approved, and certified by the Attorney General of the state, and at the time of the purchase by the bank at Billings these bonds on their face were valid obligations against the town of Covington. There was nothing on their face to suggest that they were invalid, and who would question the validity of those bonds from such an examination of them as a director in a bank would be expected to make?

In Board of Education v. James, 49 F. (2d) 91, 99, in a case which went up from this court, the Tenth Circuit Court of Appeals said: "It is well settled that, where a

municipal corporation has lawful authority to issue bonds on condition that certain facts exist or certain acts be done, and the statute entrusts the power and imposes the duty upon an official or officials to ascertain, determine and certify the existence of such facts at the time of issuing the bonds, the certificate of such official or officials will estop the municipality as against a bona fide holder of such bonds from proving its falsity to defeat them (*Independent School Dist. v. Rew* [C. C. A. 8] 111 F. 1, 55 L. R. A. 364), where there is nothing on the face of the bonds to show that the recital is untrue. Gunnison County v. Rollins, 173 U. S. 255, 270, 271, 19 S. Ct. 390, 43 L. Ed. 689; Chaffee County Com'rs v. Potter, 142 U. S. 355, 363, 12 S. Ct. 216, 35 L. Ed. 1040."

Assuming, therefore, that there might have been conditions actually existing at the time of this election which would invalidate the bonds, what was there that the board of directors could do toward the examination of these bonds which could satisfy them as to their legality? Counsel has indicated that they might have visited Covington. That would have been a very valuable acquisition of knowledge—see the town of Covington and find out that an election had been held. At the particular time when the bonds were purchased, nothing had been done, and nothing was done for some time thereafter, toward testing the validity of these bonds in court. But this court does not feel that it was the duty and the function of the members of the board of directors of ordinary banking intelligence to presume to pass upon the validity of a bond issue. They had employed a cashier in good faith, who had come highly recommended to them by one of the leading bankers of the state, and up until the time that the bank closed not one word of criticism had ever come to the directors which would cause the slightest suspicion as to the proper conduct of Chatburn and Fitzgerald. Fitzgerald had purchased the controlling interest in the Billings bank; he was the president of the American State Bank at Covington; was the city treasurer; and those directors had a right to assume that the cashier and, in effect, the managing director had exercised reasonable business judgment in the purchase of these bonds. These bonds bore 6 per cent. interest; they were good bonds at the time they were purchased so far as these directors knew.

It is true that Fitzgerald knew that he had no right to sell these bonds; that he was holding them as city treasurer of Covington; that he had no right to put them in the assets of the Covington bank, and that when he sold the bonds to the Billings bank, that he was perpetrating fraud and deception on that institution. Chatburn, the cashier of the Billings bank, more than two years prior to the close of the bank, knew that there was a serious question as to the validity of these bonds, that they had been held void by the district court of Garfield county, and that the case was on appeal to the Supreme Court, and that that information should have been disclosed by him to the board of directors; but he, at the suggestion and request of Fitzgerald, said nothing to the other members of the board of directors. Clearly the conduct of Fitzgerald and Chatburn was reprehensible and also constituted such a violation of the national banking laws as to make them liable under the complaint filed herein.

As to the defendants Pierce, Frazier, Back, and Adriance, there is no evidence in this case that their conduct was anything but in good faith or that they knowingly or willfully violated any regulation governing national banks, or in fact that their conduct was anything other than that which would have been expected of ordinarily careful and prudent persons in their places.

Judgment will be rendered as prayed against defendants Fitzgerald and Chatburn. Judgment will be rendered in favor of defendants Pierce, Frazier, Back, and Adriance. Proper form of judgment may be prepared and submitted consistent with this opinion. An exception is allowed the plaintiff and to the defendants Fitzgerald and Chatburn.