TREMBERT *v.* MOTT.

1. CORPORATIONS—HOLDING COMPANIES—BANK AND TRUST COMPANY STOCK.

    Company holding shares of stock in banks and trust companies *held,* a lawful corporation.

2. CONTRACTS—RESCISSION—MISTAKE—FRAUD.

    Rescission of a contract is not a remedy which will lie in the absence of mutual mistake or unilateral mistake induced by fraud.

3. BANKS AND BANKING—DEFALCATIONS OF OFFICERS AND EMPLOYEES —STOCKHOLDERS' CONTRIBUTION AGREEMENT—RESCISSION.

    Bank stockholder who voluntarily signed contribution agreement to partially reimburse president and director who had saved bank from failure by paying over to it a large sum which it had lost through defalcations of officers and employees at a meeting when it was announced that some defalcations had

occurred prior to merger of banks, who did not hear such announcement or inquire as to amount of prior defalcations *held*, not entitled to rescind contribution agreement because amount of prior defalcation had been fraudulently concealed, or, that she signed under mistake of fact.

4. SAME—RESCISSION—FRAUD.

The fact that before bank stockholder had signed contribution agreement to reimburse president and director, who had saved bank from failure by paying into it net sum which it had lost through defalcations of officers and employees, at a meeting when amount of defalcations had been announced, but no statement made of amount of shortage at different times *held*, not fraud entitling such stockholder to rescission of agreement where it did not appear such information could be ascertained from the records before the meeting or that such information would have influenced plaintiff's action.

5. SAME—PRESIDENT—DIRECTOR—LIABILITY FOR DEFALCATIONS OF OFFICERS AND EMPLOYEES.

Liability of one who. was either bank's president or chairman of its board of directors in period during which defalcations of officers and employees occurred is to be tested by his duty as a director where there was no showing that his duties were other than to preside at meetings of the board.

6. SAME—OFFICERS—DIRECTORS—FIDUCIARY RELATION.

Generally, an officer or director of a bank must exercise the same degree of fidelity and care which an ordinarily careful man would use in his own affairs of like magnitude and importance, but, in this State, a director need not give his whole time to bank's affairs.

7. SAME—DIRECTORS—NEGLIGENCE.

Bank director may not be held liable to bank as for negligence by mere showing of defalcation of officers and employees, or loss, or his mere failure to attend meetings of directors.

8. SAME—DIRECTORS—DUTIES—SOURCE.

Duties of a bank director must be found from statutes, corporate by-laws, generally accepted practice of the business, custom of the individual bank and circumstances of the particular case.

9. SAME—DIRECTORS—DUTIES—NATURE.

A bank director need not be an expert banker, bookkeeper or accountant; is not required to oversee individual transactions;

keep, check or audit books; spy on officers; nor devote himself to details; but may intrust routine business of bank to officers and employees of the bank without incurring liability to the bank for their defalcations.

10. SAME—BOARD OF DIRECTORS—COMMITTEES.

The board of directors of a bank may act through committees and accept their findings in the absence of circumstances casting doubt on them without holding individual directors liable for defalcations of officers and employees.

11. SAME—DIRECTORS—GENERAL DUTIES.

Bank director must have a general knowledge of the financial conditions of the bank, its system of management and daily workings and exercise a reasonable degree of oversight and supervision of the bank's affairs in the selection of officers and providing for such audits, examinations and reports as reasonably seem necessary or be subject to liability for defalcations of officers and employees.

12. SAME—DIRECTORS—CONDUCT OF OFFICERS OR EMPLOYEES—SUSPICION.

A bank director cannot disregard matters presented to the board of directors nor a failure to present what should be shown nor close his eyes to suspicious conduct of officers or employees nor conduct which would put an ordinarily careful person on guard and cause him to inquire, without subjecting himself to liability for defalcations of officers and employees.

13. SAME—DIRECTORS—NEGLIGENCE—BURDEN OF PROOF.

Stockholder, claiming director of bank was liable for defalcations of officers and employees because negligent in not discovering them, has burden of proof of negligence.

14. SAME—DIRECTORS—NEGLIGENCE—EVIDENCE.

In suit by bank stockholder for rescission of contribution agreement to reimburse president and director for amount he paid over to bank to save it from failure due to defalcations of officers and employees, record *held,* not to show negligence on his part in failing to discover such defalcations which took expert accountants, aided by defaulters, nearly a year to trace.

15. SAME—DIRECTORS—PURCHASE OF STOCK—CASH ITEM—EVIDENCE.

That bank director left standing order to purchase its stock for him in his absence and bank, in doing so, carried it as a cash

item until his return and payment therefor *held*, insufficient to subject him to liability for defalcations of officers and employees on theory bad example was thereby set for and influenced them, where there is no proof he knew of method of handling his valid transaction or of its influence upon defaulters.

16. SAME — DIRECTORS — NEGLIGENCE — BROKERAGE WIRES — COSTLY HOUSE OF OFFICER.

Bank director *held*, not guilty of negligence in failing to discover defalcations of officers and employees because of establishment of private brokerage wires in bank where it is not shown they were not customary in banks handling collateral loans, nor was director negligent because an officer is claimed to have built a house beyond his apparent means where record does not show cost of house or his salary nor that defendant knew the officer was building a house or his financial condition.

17. SAME—CONTRIBUTION AGREEMENT—RESCISSION—FRAUD.

In suit by bank stockholder to rescind contribution agreement to reimburse president and director for sum he paid over to bank to save it from failure due to defalcations of a number of officers and employees, which agreement was signed by plaintiff at meeting of stockholders called for the purpose, defendant director *held*, not guilty of fraud in failing to disclose he was legally liable for such defalcations when in fact he was not so liable.

18. FRAUDS, STATUTE OF—CONTRIBUTION AGREEMENT—DEBT OF ANOTHER—SIGNATURES.

Agreement, signed by stockholder, to contribute toward reimbursement of bank president and director for sum he had paid into bank to save it from failure because of defalcations of officers and employees *held*, not within statute of frauds as an agreement to answer for the default of another and not vitiated by failure of the director and bank to sign it, since it was signed by the party to be charged (3 Comp. Laws 1929, § 13417).

19. CANCELLATION OF INSTRUMENTS—CONTRIBUTION AGREEMENT—NEGLIGENCE—SIGNATURES.

In suit to rescind contribution agreement and cancel notes plaintiff gave pursuant thereto, if failure to sign agreement by bank and director who was being reimbursed thereby, had any effect upon her signing note, her negligence in failing to discover its condition precludes rescission.

20. BANKS AND BANKING—CONTRIBUTION AGREEMENT—RESCISSION—
MUTUALITY—PARTIAL PERFORMANCE.

Bank stockholder who signed contribution agreement to reimburse president and director for sum he had paid into bank to save it from failure because of defalcations of officers and employees *held,* not entitled to rescission of agreement for failure of bank and director to sign it since the contract was made mutual by partial performance which, so far as indicated by the record, was substantially full performance.

21. BILLS AND NOTES—CANCELLATION OF INSTRUMENTS—NOTICE TO PAYEE.

In suit by bank stockholder who had signed contribution agreement to reimburse president and director for sum he had paid into bank to save it from failure because of defalcations of officers and employees to rescind agreement and cancel promissory note given pursuant thereto on ground of fraud and mistake, plaintiff *held,* not entitled to cancellation of renewal of such note where it is not shown payee had notice or knowledge of alleged infirmity.

Appeal from Genesee; Gadola (Paul V.), J. Submitted April 10, 1935. (Docket No. 68, Calendar No. 38,253.) Decided May 17, 1935.

Bill by Susan L. Trembert against Charles S. Mott and others to rescind contribution agreement, to have a note held by Guardian National Bank of Commerce cancelled, for an accounting and other relief. From decree for defendants, plaintiff appeals. Affirmed.

*Farley & Elliott* (*Guy W. Selby,* of counsel), for plaintiff.

*Brownell & Gault* (*Morris Zwerdling,* of counsel), for defendant Mott.

*Charles E. Lewis,* for defendant receiver of Guardian Detroit Union Group, Inc.

*Warren, Hill, Hamblen, Essery & Lewis* (*William C. Allee* and *Edward H. Yost,* of counsel), for defendant receiver of Guardian National Bank of Commerce.

*Wilson & Hoffman,* for defendant Union Industrial Trust & Savings Bank and its receiver.

FEAD, J. For some years plaintiff owned stock in the Union Trust & Savings Bank of Flint, which she had inherited from her former husband, once a director of the institution. May 29, 1929, the bank merged with the Industrial Savings Bank into the Union Industrial Trust & Savings Bank (familiarly called Union Industrial Bank), and plaintiff exchanged her stock for shares in the latter.

In September an arrangement was made for exchange of the stock of the Union Industrial Bank for shares in the Union Commerce Corporation, a holding company, with headquarters at Detroit, at a ratio of five for one. Plaintiff delivered her certificates September 27, 1929, and interim certificates for exchanged stock in the Union Commerce Corporation were transmitted to and held in possession of an officer of the Union Industrial Bank. Late in 1929 or early in 1930 the Union Commerce Corporation merged into the Guardian Detroit Union Group, Inc., which we will call the Guardian Group. It was a holding company of bank and trust company shares. Plaintiff received stock in the Guardian Group for her Union Industrial shares.

At the time of the merger of the two Flint banks in May, no audit of either was made. However, an examining committee was appointed. The committee did not get seriously to work until October. It discovered items which caused it to make inquiries

and an astounding thing happened. October 31st, officers and employees confessed that 12 of them, representing the whole executive force of the bank except one officer, had been engaged in speculation with the old and new bank funds, and their shortage was about $800,000. In a week, the shortage was found to be $3,581,000. Thereafter an audit of the books by expert accountants, which required nearly a year to complete, disclosed that defalcations had occurred for a long time in the Industrial Savings Bank, aggregating about $21,000,000, from January 1, 1928, to October 31, 1929, the net shortage was $930,000 on May 29, 1929, when the Flint banks were merged, was about $1,800,000 on September 27th, when plaintiff deposited her stock for exchange for shares of the Union Commerce Corporation, and the balance of about $1,700,000 occurred thereafter. The record indicates only the general method of operation, not the specific transactions. Sometimes moneys withdrawn to make purchase of stock were represented by cash item slips, which were taken out on sale of the stock, and sometimes forged notes were used to cover the defalcations.

Defendant Mott had been president and director of the Industrial Savings Bank for several years, to January 1, 1929. In 1929 he was director and chairman of the board. He was president and director of the Union Industrial Bank. When the disclosures of defalcations were made, Mr. Mott saved the Union Industrial Bank by paying into it $3,581,000, having borrowed it, or some, for that purpose from the Guardian Detroit Bank, later merged into defendant Guardian National Bank of Commerce. The other directors agreed to reimburse him to the extent of 50 per cent. of their stock.

Some time later a call was sent to the stockholders to meet on November 29, 1929, to consider how they should make proportionate contribution to reimburse Mr. Mott. The meeting was called to order by him and, after a few formal remarks to the effect that each stockholder must determine his own course, he called Mr. Cook, attorney for the bank, to preside. Mr. Cook outlined the situation, stating the amount of the shortage at $3,581,000, gave a general resumé of how the peculations had occurred, and said there had been a small defalcation before the merger of the Flint banks, more between then and affiliation with the Union Commerce Corporation, and the greater part thereafter. He then turned the meeting over to the stockholders, invited remarks and questions, and a general discussion followed, most of the speakers lauding Mr. Mott and urging his reimbursement, although one advocated delay until the defaulting officers had been brought to trial and the full situation had been disclosed. It was made plain that the obligation to reimburse Mr. Mott was not legal. It was argued by several speakers as a moral obligation. The proposition was presented, and adopted without dissent, that the stockholders contribute 25 per cent. of their Union Commerce shares, either in stock or in cash at $135 per share. An agreement to that effect was read to the stockholders and, at the end of the meeting, signed by them. The agreement purports to be a contract by the bank, Mott and the contributors, but, at the trial, it was discovered that neither the bank nor Mott had signed it.

Thereafter, a committee was appointed to recover from the offenders, and a large amount was finally retrieved. Plaintiff received $2,379.75 therefrom, which was credited on her note in February, 1931.

Under the arrangement the stockholders had until June 1, 1930, to make contribution. June 2, 1930, plaintiff executed her note for $27,127.50, payable to the Guardian Detroit Bank. She delivered it to a member of the recovery committee, who forwarded it to the bank with the statement that plaintiff wanted to exercise the option of paying cash instead of stock. The proceeds were credited upon the note of Mr. Mott. Shortly thereafter two certificates of plaintiff's stock in the Guardian Group were issued, one for 362 shares, retained by the bank as security for the note, and one for 265 shares delivered to plaintiff. The Guardian Group stock at that time was valuable and plaintiff could have sold at a large profit. Twenty-five per cent. of her stock would have more than paid the note. She and many others believed the stock would appreciate greatly in price and she refused to sell at $132 per share a little later.

Plaintiff renewed the note five times at 90-day periods. She paid sums on principal and interest besides the credit from the recovery. September 1, 1931, the bank wrote her to the effect that it had agreed to carry the note, as collateralled, for only a year, that by decrease of the market value of the stock the note was undercollateralled and it asked for more security. Thereupon, plaintiff consulted an attorney. The attorney sent a renewal note for $22,000 but with notice that it was without prejudice to plaintiff's rights. Further renewals and payment were refused.

The looting of the bank stunned the city, not only because of the amount purloined but because of the large number of highly respected citizens engaged in the defalcations. Mr. Mott's prompt action avoided closing the bank and complete loss to the

stockholders. The officers at once determined upon a policy of frankness and disclosure. Full information was given to the press. The confessions of the defaulters were published and given detailed publicity. The manner in which they manipulated the books was set out. Some 58 articles were published in the local newspapers. Plaintiff was interested and read the accounts although she said she did not read all of them in full.

Plaintiff commenced this suit July 1, 1932. Both the Guardian Group and Union Industrial Bank are in receivership. The Guardian Group has been held a lawful corporation. *Simons* v. *Groesbeck*, 268 Mich. 495. These facts dispose of some of the original issues. The remaining prayer is for rescission of the contribution contract and damages against Mott for mistake, fraud and negligence and for cancellation of the note and recovery of moneys paid thereon, as against the Guardian National Bank of Commerce. The court entered decree dismissing the bill.

Plaintiff treats ignorance of facts as mistake of fact, justifying rescission. She cites no authority and we know of no principle which will sustain the remedy in the absence of mutual mistake or unilateral mistake induced by fraud.

Plaintiff claims Mott was legally liable for the defalcations by reason of negligence in the performance of his duty as an officer and director of the bank and she has evolved a theory that, by way of subrogation to the original right of action of the bank against him for such negligence, she may recover. The contention needs little discussion. All damage to the bank and its stockholders from such negligence, if any, was repaired by Mott's payment of the loss. Plaintiff's action is not for the negligence

but for concealment of it. It is part of her claim of fraud.

Plaintiff never talked with Mott about the matter and there is no claim of direct misrepresentation of fact. Her case is that he induced her to sign the contribution agreement and note by concealment of material facts, among which was his own legal liability for the defalcations by reason of his negligence.

Plaintiff's testimony begins with a categorical denial of knowledge of many facts connected with the transaction which had been given wide publicity. Most of them require no notice. We will confine discussion to those which, in their brief, her counsel have set out as the most important and on concealment of which her claim of fraud must rest, *i. e.,* that when she executed the agreement and signed the note she did not know there had been a shortage in the Industrial Savings Bank at the time of the merger nor its size; she did not know that the defalcations amounted to $21,000,000 from January 1, 1928, to October, 1929; she did not know Mr. Mott, as president and chairman of the board and director of the Industrial Savings Bank, had attended only two out of 175 meetings of the board before the merger and as president and director of the Union Industrial Bank had attended one out of 14; she did not know Mr. Mott was legally liable for the loss because of his negligence. And, urged as a mistake of fact, she did not know the contract of contribution had not been signed by Mott and the bank and was not binding on her when she gave the note.

Prior to the meeting of November 29th, newspaper articles had given rather full accounts of the defalcations and the *modus operandi* of the defaulters, stating that the peculations had started in 1926,

and containing criticism of the officers of the bank for negligence. Plaintiff read or scanned most of the articles but would identify none. However, she did not attend the meeting in total ignorance of the situation. She testified:

"I had heard of the stock speculations by the officers and employees, and that a loss of three and a half million had been sustained by the bank. I read most of what was published in the Flint Daily Journal on that. I knew when I signed Exhibit 2, I was signing up for part of the defalcations of three and a half million dollars and that these defalcations had been brought about by stock speculations by the officers and employees. I knew the money had been taken and that there must have been considerable laxity around the bank to suffer that loss and considerable negligence of the people around the bank in permitting that loss, after I read the paper. I knew that before I went to the meeting on November 29th."

On her way to the meeting plaintiff was informed by a lawyer, a partner of Mr. Cook, that she had no obligation to make contribution. She said that when she was about to sign she asked Mr. Cook if she had to do so and he said all stockholders had to sign. It does not appear that Mr. Mott heard such statement. Mr. Cook denied the conversation. The court gave it no weight in determination of the case, nor do we. Plaintiff had forgotten a great many things said at the meeting, but the lack of legal liability on the part of stockholders was emphasized. Plaintiff stated that her agreement to contribute was voluntary.

She said she did not hear Mr. Cook say that part of the defalcation had occurred before the merger.

The purpose and character of the meeting raised a duty on the part of both Mr. Mott and the plaintiff. Mott was obligated to permit no misrepresentation or concealment of material facts. Plaintiff was bound to listen. The fact was disclosed that part of the defalcation had occurred before the merger. As plaintiff claims she did not hear it, she was not misled by the statement that such defalcation was small. It does not appear that the amount was then known nor discovered until the subsequent audit.

Under the circumstances, and because reimbursement of Mott was impressed as a moral obligation of the stockholders, his legal liability for the loss, or his conduct as a director from which his legal liability could be estimated, was a material fact which the stockholders were entitled to know as a basis for their own action. The other basic fact was the amount of the defalcation paid by him. The details were secondary. They were described in general. Neither Mr. Mott nor the speakers could know what further specific information a stockholder desired. If plaintiff had heard the statement that a defalcation had occurred before the merger and wished to know its size, it would have been her duty to inquire. This is not a violation of the rule that a defrauded party has no duty of diligence to discover fraud, perpetrated. He cannot wilfully close his mind to information easily available.

Plaintiff, however, insists that it was the duty of the directors to know the amount of the total defalcation and shortages at different times and disclose them at the meeting. It does not appear they could have ascertained them before the meeting. It is a much more difficult matter to rebalance books as of a prior date and audit them than currently.

In any event, plaintiff does not indicate in what respect knowledge of the total defalcations or of the shortage at a particular time could have influenced her action. Nor can we see what difference it would have made. And the record indicates that plaintiff was not interested in the details. She testified:

"I made no inquiry after the meeting of November 29th, whether the money had been taken in cash, securities or by kiting drafts or speculation in stocks. I never asked anyone any time after November 29th until June, 1930, anything about the manner in which these abstractions had been made. I was satisfied that the three and one-half million dollars had been taken by these men. I signed the agreement to pledge my proportionate share. That was the obligation I took, as I understand it.

"Q. And you did not care. You did not make any claim up to the time you paid your note, how this money had been taken by these men?

"A. It had been taken; that is enough."

We discover no fraud in respect of the time and size of the defalcations.

Was defendant Mott legally liable for the defalcation on the ground of negligence? There was no showing that as president or chairman of the board he had any other power or duty than to preside at meetings of the board of directors. Consequently his liability must be tested by the duty of a director.

The general rule is that an officer or director of a bank must exercise the same degree of fidelity and care which an ordinarily careful man would use in his own affairs of like magnitude and importance. *Commercial Bank of Bay City* v. *Chatfield*, 121 Mich. 641; *Martin* v. *Hardy*, 251 Mich. 413; 1 Michie on Banks and Banking, p. 124. The use of the term "in his own affairs" in the rule has been criticized,

2 A. L. R. 867, note, as in effect requiring a director
to give his whole time to the affairs of the bank. It
has not been so used by this court.

The rule does not impose liability on a mere show-
ing of defalcation or loss nor for mere failure of a
director to attend board meetings. *Martin* v.
*Hardy, supra.* Nor are the duties of a director fixed
by rule of thumb. They must be found from the
statutes and corporate by-laws, from generally ac-
cepted practice of the business, from the custom of
the individual bank, and the circumstances of the
particular case.

A bank director need not be an expert banker,
bookkeeper or accountant. He is not required to
oversee individual transactions, keep the books,
check or audit them, spy on the officers nor devote
himself to details. He is entitled to intrust to
officers and employees the routine business of the
bank. It is an accepted thing that directors of
banks may be business men whose principal activi-
ties are elsewhere and whose banking activities can-
not be more than customary general supervision.
The board may act through committees and accept
their findings in the absence of circumstances cast-
ing doubt upon them. On the other hand the direc-
tor must have a general knowledge of the financial
condition of the institution, its system of manage-
ment and daily workings and exercise a reasonable
degree of oversight and supervision of the bank's
affairs. The latter requires care in the selection of
officers, providing for audits and examinations and
reports as reasonably seem necessary. The direc-
tor cannot disregard matters presented to the board
of directors nor a failure to present what should be
shown nor close his eyes to suspicious conduct of

officers or employees nor conduct which would put an ordinarily careful person on guard and cause him to inquire. 1 Michie on Banks and Banking, p. 126.

Plaintiff had the burden of proof of negligence. There was no showing that the board of directors did not carefully select the officers, and require reasonable inspections, audits and reports, nor that they were not had. Presumably the examinations by the directors required by law were made. Presumably the semiannual examinations by trained men of the State banking department, cognizant of methods of misappropriation of funds and on guard, were had. In fact official examination had been made in June, 1929. No suspicious circumstances were found by any of the examiners. Nothing came to the attention of the board which caused suspicion. A director who was an officer of an allied trust company, working in an adjoining office and was in daily touch with the bank, saw nothing amiss. After the merger, Mr. Mott was at the bank, consulting the officers frequently. Experience has demonstrated the possibility of defalcation by a single person over a period of years. Twelve executives, working together, are able to hide their tracks. They did so well that, even with their assistance, it took expert accountants nearly a year to trace the ramifications of their operations. The testimony regarding the defalcations was quite general. There was no showing of specific operation which would indicate that a director, either in the exercise of his legal duties or in attempting a more detailed examination, would have been likely to have discovered irregularities in the cash items or notes. Unless Mr. Mott disregarded suspicious circumstances, the record fails to show a breach of duty.

Plaintiff names specific circumstances which she claims should have put Mott on guard; that cash items were permitted for him and others and a bad example set; a private wire to brokerage houses was established in the bank; and an officer built a house beyond his apparent means.

There were two Mott cash item transactions in 1926. Apparently he had a standing order to buy stock of the bank and the bank bought it in his absence, carried the cost as a cash item until he arrived and he paid it. It is not shown that he authorized or knew of the manner in which the transaction was carried. There was nothing wrong about it, although it is not commendable banking. In any event, Mott could hardly be held liable for peculations merely because his valid transaction may have suggested to the defaulters a method of operation and of which influence there is no proof.

It does not appear that Mr. Mott knew of the private brokerage wires nor was there evidence that they are not customary in banks handling collateral loans. We cannot guess that they were. They aroused no suspicion in the minds of directors constantly about the bank. As to the house, there was no showing that defendant knew the officer was building it or his financial condition. The record does not show the cost of the house nor the officer's salary.

A large number of authorities upon the liability of directors for peculations of officers may be found collected in 2 A. L. R. 867, note. See, also, *Bates v. Dresser,* 251 U. S. 524 (40 Sup. Ct. 247). None has been found which indicates that the proof at bar shows actionable negligence on the part of defendant Mott. Consequently, there was no fraud in

failing to disclose to plaintiff what did not exist, i. e., that he was legally liable for the defalcations.

Plaintiff contends the contribution agreement was void under the statute of frauds, 3 Comp. Laws 1929, § 13417, because it was a promise to answer for the default of another and was not signed by Mott and the bank and also because the parties contemplated it should not be effective until signed by all of them. She asks rescission of the contract and note on the ground that the note was executed under mistake of fact as to the binding character of the contract.

The agreement was not to answer for the default of another but was for a voluntary contribution. It was signed by the party to be charged (plaintiff). There was no understanding as to signing. Plaintiff exhibited no concern as to its condition. If it had any effect upon her signing the note, her negligence in failing to discover the condition precludes rescission. 9 C. J. p. 1169. The contract was made mutual, and cannot be rescinded, by partial performance which, so far as indicated by the record, was substantially full performance. 9 C. J. p. 1195. And there was no showing the bank had notice or knowledge of the infirmity now claimed. *First National Bank & Trust Co.* v. *Wuerth,* 262 Mich. 691.

Decree affirmed, with costs.

POTTER, C. J., and NELSON SHARPE, NORTH, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.